**Kenneth LONO, Petitioner-Appellant,**

v.

**Charles E. FENTON, Warden, Marion Federal Penitentiary, Respondent-Appellee.**

**No. 77–1141.**

United States Court of Appeals, Seventh Circuit.

Reheard In Banc June 7, 1978.

Decided July 25, 1978.

Jerold S. Solovy, Eugene R. Wedoff, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Mary Beauparlant, Asst. U. S. Atty., East St. Louis, Ill., for respondent-appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT, CUMMINGS, PELL, SPRECHER, BAUER and WOOD, Circuit Judges.*

HARLINGTON WOOD, Jr., Circuit Judge.[1]

Petitioner Lono, an inmate of the federal penitentiary at Marion, Illinois, appeals from the district court's denial of his application for a writ of habeas corpus, which seeks his return to the Hawaii state penitentiary where he was originally incarcerated after pleading guilty to murder and rob-

---

* Judge Tone took no part in the consideration and decision of this case.

1. Much of the preliminary part of this opinion has been adopted from the opinion of the original panel with the consent of its author, Judge Bauer.

bery charges in an Hawaii state court. He argues that 18 U.S.C. § 5003 authorizes the transfer of state prisoners to federal custody only upon a showing that the prisoner is in need of specialized treatment unavailable in the state system, and that due process requires a hearing on that issue prior to any administrative transfer. Alleging that he was denied a hearing in connection with his transfer, Lono asks that a writ of habeas corpus issue directing his return to the Hawaii state prison system.

Following his conviction in an Hawaii state court for murder and armed robbery, Lono was incarcerated in the Hawaii state penitentiary until October 22, 1967. On that date he was transferred to the federal penitentiary at Leavenworth, Kansas, under the provisions of a contract between state and federal officials that was authorized by Hawaii Revised Statutes § 353–18 and 18 U.S.C. § 5003. On July 19, 1968, Lono was transferred to the federal prison at Lewisburg, Pennsylvania, and, on February 2, 1969, to the federal penitentiary at Marion, Illinois.

The parties have stipulated that Lono has never received any hearing on, or a statement of the reasons for, his transfer from the state to the federal prison system. Lono testified at an evidentiary hearing held by the district court that, as a result of his transfer to federal prisons on the mainland, he has been unable to see any of his friends or family for over ten years. Even more serious, he has been unable to communicate with counsel familiar with Hawaiian law so that he can petition for resentencing under the provisions of a 1972 amendment to the Hawaii Penal Code. Moreover, he is unable to formulate such a petition on his own because the Hawaiian legal materials he needs to do so are not available at the federal penitentiary at Marion.

■ On appeal, Lono argues that, because his transfer from state to federal facilities imposed a "grievous" loss on him, he was entitled under the due process clause to a hearing on the need for his transfer. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). He recognizes that *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), establishes that, if the state and federal officials had administrative discretion to transfer him for any reason or no reason at all, his due process claim would have no merit. He contends, however, that *Meachum* is distinguishable because 18 U.S.C. § 5003 conditions the authority of federal officials to accept state prisoners into custody on a showing that the prisoners are in need of specialized treatment available only in the federal system. Accordingly, Lono argues that, because the statute conditions any administrative transfer on his need for specialized treatment, he is entitled to a hearing on that issue both by the due process clause and the statute itself.

The respondent agrees with Lono that, if 18 U.S.C. § 5003 is construed to require a showing of a prisoner's need for specialized treatment as a condition precedent to his administrative transfer, then Lono would be entitled to a hearing on that issue. Respondent disagrees, however, that the statute should be so construed.

We reverse and see no need to further consider the right to hearing issue.

Petitioner's claim, thus, turns on our construction of the statute.

The statute at issue, 18 U.S.C. § 5003, provides in relevant part:

(a) The Attorney General, when the Director [of the Federal Bureau of Prisons] shall certify that proper and adequate treatment facilities and personnel are available, is hereby authorized to contract with the proper officials of a State or Territory for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such State or Territory: *Provided*, That any such contract shall provide for reimbursing the United States in full for all costs or other expenses involved.

Lono argues that, because the statute on its face authorizes transfers only when

"proper and adequate *treatment facilities and personnel*" are available, it necessarily follows that the only authorized purpose for any transfer is the provision of specialized treatment. (Emphasis added.) Respondent reads the statute as requiring only a certification that the Bureau of Prisons can handle an additional prisoner.

We read Section 5003 as Lono does. The language emphasizes "treatment facilities." That terminology is unique. Elsewhere in the statutes relating to prisons they are generally referred to as "penal and correctional institutions," not "treatment facilities." Also in contrast see 18 U.S.C. § 4002, which authorizes the Bureau of Prisons to contract with the states for the safekeeping of federal offenders. The emphasis there is on "imprisonment" without any mention of "treatment."

We do not believe Section 5003 to be ambiguous, but respondent's reading of the statute suggests that it is. In that event we turn to the legislative history which totally bears out our interpretation of the statute.

The draft legislation originated in the Department of Justice and was introduced in the Senate at the request of Deputy Attorney General Peyton Ford, who explained in a letter to Senator Pat McCarran, Chairman of the Senate Judiciary Committee, the reason for the proposed legislation:

Frequently, State officials request the Bureau of Prisons to undertake the custody, treatment, and training of State prisoners where specialized types of institutions and training programs are indicated but not available to the States. These requests usually relate to juveniles, concerning whom many of the States are without satisfactory institutions and training programs.

S.Rep.No.978, 82 Cong., 1st Sess. 2 (1951).

The Senate passed the bill as drafted by the Department of Justice, without relevant amendment and without debate. In introducing the bill prior to its passage, Senator McCarran explained that it would authorize federal custody of state prisoners "under certain conditions in a limited category of cases, . . . ." 97 Cong.Rec. 13543 (1951). The House Judiciary Committee then considered the bill and recommended passage in a report which again emphasized that its purpose was to allow use by state prisoners of specialized programs not available within the state prison systems. Juveniles and drug addicts were noted as examples of the prisoners for whom states had requested such transfers. H.R.Rep.No.1663, 82d Cong., 2d Sess. 1 (1952) reprinted in [1952] U.S.Code Cong. & Admin.News, pp. 1420, 1421. The House Report contains the following statement in its discussion of the "Contents" of the bill:

The proposed legislation restricts or limits the use of Federal prison facilities to those convicted State offenders who are in need of treatment. The term "treatment" as used in this bill, in addition to its ordinary meaning of providing medical care, is also meant to include corrective and preventive guidance and training as defined in the Youth Corrections Act (sec. 5006g, title 18, U.S.C.).

H.R.Rep.No.1663 at 2, [1952] U.S.Code Cong. & Admin.News, p. 1421. The bill subsequently passed the House without debate or amendment. 98 Cong.Rec. 4801 (1952).

This legislative history makes it clear that the statute is not ambiguous and that the word "treatment" is advisedly used.

Sometime after its adoption the Bureau of Prisons began to give it a much broader interpretation. Respondent was unable to give us any insight as to when, how or why that came about. Ordinarily we would defer to the Bureau's administrative construction of the Act as not limiting the Bureau to accepting only those prisoners in need of specialized treatment as being "entitled to great weight and should be followed unless there are compelling indications that it is wrong." *Old Ben Coal Corp. v. Interior Board of Mine Operators Appeals*, 523 F.2d 25, 36 (7th Cir. 1975). We believe that there are compelling indications that the Bureau interpretation is wrong. Therefore any arguments as to need or justification

for the broader authority that there may be, should be addressed to the Congress and not to us. *Securities & Exchange Commission v. Sloan*, 436 U.S. 103, 116, 98 S.Ct. 1702, 1711, 56 L.Ed.2d 148 (1978).

We find little guidance in other cases which have considered Section 5003 since they are primarily concerned not with the basic statutory construction but with entitlement of the prisoner to a pre-transfer hearing.[2] In *Duncan v. Madigan*, 278 F.2d 695 (9th Cir.), *cert. denied*, 366 U.S. 919, 81 S.Ct. 1096, 6 L.Ed.2d 242 (1960), a Maine prisoner confined at the Alcatraz federal prison challenged his confinement by petition for habeas corpus upon the basis that Section 5003 by its terms applied only to youthful offenders. That contention was rejected by that court without resort to the legislative history. We find no fault with that decision. As we would not read Section 5003 as broadly as respondent urges, neither would we read it so narrowly as the prisoner urged in *Duncan v. Madigan, supra.*

■ The respondent calls our attention particularly to *United States ex rel. Gereau v. Henderson*, 526 F.2d 889, 896 (5th Cir. 1976), for the proposition that prisoner transfers should be left to the "sound discretion of the prison authorities." We agree provided the exercise of that discretion is within the statutory limits. That case involved the transfer of five notorious prisoners convicted of murder in the Virgin Islands to mainland federal prisons. There petitioners focused on two contentions: "First, the transfer of a territorial prisoner to a federal prison offends state sovereignty and is beyond the power of Congress to authorize, and, second, the summary nature of their transfers violates their right to

minimal elements of due process." 526 F.2d at 893–94. Neither is our issue. Neither issue called for an interpretation of the particular statutory language or resort to the legislative history of Section 5003.

It was not intended by Section 5003 to put the federal government in the rent-a-prison business unless there was some special treatment need with which the state required assistance. Absent that special need the states were left to care for their own.

■ Section 5003 is the only relevant Act of Congress allowing federal confinement of state prisoners. Therefore, compliance with its terms is necessary to effect the transfer of a state prisoner to federal custody. Congress has forbidden non-statutory confinement in federal prisons. "No citizen shall be imprisoned or detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a).

Reversed and remanded to the district court with directions to order the release of petitioner to the custody of the State of Hawaii within such time as the district court may find to be reasonable to effect the transfer.[3] Upon any failure to comply with that order without just cause, the district court shall issue the writ of habeas corpus and discharge petitioner.

BAUER, Circuit Judge, dissenting.

I dissent. On its face the statute simply authorizes federal officials to contract with the States "for the custody, care, subsistence, education, treatment, and training" of any state prisoners transferred to federal custody. The only conditions that Congress actually imposed on the Attorney General's authority to enter such contracts are that the Director of the Bureau of Prisons certi-

---

2. Reported decisions in the Courts of Appeals include *Gomes v. Travisono*, 490 F.2d 1209 (1st Cir.), *vacated and remanded*, 418 U.S. 909, 94 S.Ct. 3200, 41 L.Ed.2d 1155, *aff'd and modified*, 510 F.2d 537 (1974); *Bryant v. Hardy*, 488 F.2d 72 (4th Cir. 1973) (per curiam); and *Duncan v. Madigan*, 278 F.2d 695 (9th Cir. 1960), *cert. denied*, 366 U.S. 947, 81 S.Ct. 1675, 6 L.Ed.2d 858 (1961). The reported District Court cases include *Battick v. Stoneman*, 421 F.Supp. 213

(D.Vt.1976); *Rebiedeau v. Stoneman*, 398 F.Supp. 805 (D.Vt.1975); *Tai v. Thompson*, 387 F.Supp. 912 (D.Haw.1975); *Hoitt v. Vitek*, 361 F.Supp. 1238 (D.N.H.1973); *aff'd.*, 502 F.2d 1158 (1st Cir. 1974); *Park v. Thompson*, 356 F.Supp. 783 (D.Haw.1973); and *Capitan v. Cupp*, 356 F.Supp. 302 (D.Or.1972).

3. The State of Hawaii filed a brief as Amicus Curiae in support of respondent's position.

fy that "proper and adequate treatment facilities and personnel" are available, and that the federal government be reimbursed for the care and custody given state prisoners. Those conditions were met in the instant case.

There is simply nothing in the language of the statute itself that "restricts or limits the use of Federal prison facilities to those convicted State offenders who are in need of treatment." H.R.Rep.No.1663, 82d Cong., 2d Sess. 2 (1952), U.S.Code Cong. & Admin.News (1952), p. 1421. The majority opinion strains to find such language in the requirement that the Director of the Bureau of Prisons certify that "proper and adequate treatment facilities and personnel" be available. That certification requirement, however, speaks only to the necessity for determining whether appropriate facilities and personnel would be available for handling any prisoners received and cannot reasonably be construed as placing a substantive limitation or restriction on the purposes for which prisoners may be transferred. Those purposes are set out in the statute itself and include simple "care, custody and subsistence," as well as specialized medical treatment and rehabilitative training. I think the language of the statute itself is clear on its face and should control any seemingly inconsistent legislative history.

Moreover, the apparent discrepancy between the clear language of the statute and its legislative history results from the fact that the committee reports on which Lono relies were more concerned with explaining the need for enacting the legislation than the substance of its uncontroversial mechanics. It seems likely that Congress intended the Bureau to have whatever authority it needed to deal with the particular historical problem that prompted the bill's introduction without unduly restricting the Bureau's administrative discretion in determining the types of prisoners it would contract to receive and the purposes for which it might assume federal custody over state prisoners. In any event, the Bureau's administrative construction of the act as not limiting the Bureau to accepting only those prisoners in need of specialized treatment is "entitled to great weight and should be followed unless there are compelling indications that it is wrong." *Old Ben Coal Corp. v. Interior Board of Mine Operations Appeals*, 523 F.2d 25, 36 (7th Cir. 1975). The Bureau, after all, itself drafted this statute, prompted its introduction in the Senate, and pressed it through Congress without amendment or, indeed, much debate. Moreover, upsetting the Bureau's settled and previously unchallenged administrative construction of the statute now—over 25 years after its enactment—jeopardizes longstanding contractual relationships with many States.

Those state prisoners with compelling reasons, not including "treatment," who seek transfer to federal custody may very well pay dearly for the restrictive construction adopted by the majority. I would affirm.

PELL and SPRECHER, Circuit Judges, join in the dissenting opinion of Judge BAUER.