**Robert HOWE, Sr.**

v.

**Benjamin CIVILETTI, Attorney General for the United States, Norman Carlson, Director of the United States Bureau of Prisons,**

and

**Cornelius Hogan, Commissioner of Corrections, State of Vermont, Defendant-Intervenor.**

Civ. A. No. 78–277.

United States District Court,
D. Vermont.

Nov. 1, 1979.

As Amended Nov. 5, 1979.

David W. Curtis, Defender, Correctional Facilities, State of Vermont, Montpelier, Vt., for plaintiff.

Karen McAndrew, Asst. U. S. Atty., Burlington, Vt., for defendants.

Peter B. Brittin, Asst. Atty. Gen., State of Vermont, Montpelier, Vt., for defendant-intervenor.

## AMENDED OPINION AND ORDER

COFFRIN, District Judge.

This is a civil action pursuant to 28 U.S.C. §§ 1346, 1361, 2201 and 2202, requesting injunctive relief ordering the defendants Civiletti, the Attorney General for the United States, and Carlson, Director of the United States Bureau of Prisons not to accept custody of the plaintiff, a state prisoner, unless there is a specialized treatment program available for him in the federal prison system that is not available at the state facilities. Plaintiff also seeks a declaratory judgment that defendants Civiletti and Carlson may not accept custody of plaintiff unless the Director of Prisons first determines that a specialized treatment program unavailable at the state level is available for plaintiff in the federal facilities. Plaintiff claims that 18 U.S.C. § 5003 mandates such procedure. We permitted defendant Hogan, then Commissioner of Corrections for the State of Vermont, to intervene shortly after plaintiff brought this action.

### Facts

Plaintiff was convicted of first degree murder in the Windham Superior Court on December 13, 1976, and was sentenced to life imprisonment on February 2, 1977. On February 22, 1977, the Vermont Department of Corrections held a hearing at the St. Albans Diagnostic and Treatment Facility pursuant to Vermont Corrections Policy No. 891 to determine whether plaintiff should be transferred to an out-of-state correctional facility. The hearing officer recommended such a transfer[1] and on March 9, 1977, Cornelius Hogan, Acting Commissioner of Corrections, approved plaintiff's transfer to the federal prison system in accordance with the terms of a contract for such transfers between the federal and state governments dated February 25, 1975.

---

1. The reasons for the recommendation stated in the report are:

    1. Criterion # 1 has been met, in that no treatment programs exist in the State of Vermont, which could provide both treatment and long term maximum security supervision.

    2. Psychological and psychiatric reports indicate that Mr. Howe would be "highly resistant to treatment", "therapeutic intervention would be close to impossible".

    3. Criteria # 2 has been met, in that he is a dangerous person who could not be programmed in a community based program. This is reinforced by a psychiatric report "He is a most dangerous person who could well repeat the same pattern of assaultive behavior toward women at any time in the future."

    4. He is an escape risk, in that he did escape from the maximum security wing at St. Albans.

Plaintiff's transfer was effected shortly after Hogan approved it.

From five firsthand visits Hogan was generally familiar with federal penal institutions and the types of treatment they offered. Yearly reports of the Federal Bureau of Prisons kept him current. In addition, personnel from the Vermont Department of Corrections personally visited Vermont prisoners in the federal system every six months. Nevertheless, at the time he authorized plaintiff's transfer Hogan did not have a list of specific federal treatment facilities and programs available to Howe; he had a general knowledge of what was available and of the contract which provided that the Bureau of Prisons could and would furnish necessary treatment programs. Hogan, in approving the transfer, felt strongly that Vermont could not provide Howe with the necessary degree of maximum security and that his treatment needs exceeded the capabilities of the Vermont system.

Just prior to his transfer, plaintiff was confined in the maximum security (D) wing of the St. Albans Diagnostic and Treatment Facility. He was transferred first to the federal penitentiary at Atlanta, Georgia, and later to the federal penitentiary at Terre Haute, Indiana. Particular programs available at these two institutions included psychiatric counseling, alcoholics anonymous meetings, drug abuse sessions, educational courses and vocational and work training. In addition there were religious programs administered by Chaplains, a library, television, movies and various athletic programs. As a resident in a federal maximum security penitentiary, plaintiff had the same complete freedom of movement within the institution as the other prisoners. At St. Albans, Howe did not enjoy this freedom of movement within the institution and was more or less confined to D wing. The programs at St. Albans, however, were substantially similar to those at the federal institutions although somewhat less accessible to Howe because of restrictions on his ability to move about the St. Albans Facility. The only two programs in which he actually participated at St. Albans were psychiatric counseling and educational courses but others probably were available to him if he wished. At Terre Haute plaintiff ran a sewing machine until he had a heart attack, about a month before he was returned to Vermont for this litigation. His principal activities now are knitting and crocheting.

## Discussion

Vermont has not had a long-term maximum security penal institution since 1975. At that time it entered into a contract pursuant to Vt.Stat.Ann. tit. 28, § 706[2] with the United States to house its maximum security inmates in the federal system in return for payment of the costs of such confinement. A three judge panel of this court found this arrangement to pass constitutional muster. *Rebideau v. Stoneman*, 398 F.Supp. 805 (1975), *aff'd*, 575 F.2d 31 (2d Cir. 1978) (*per curiam*). Plaintiff makes no claim that the state lacked statutory authority for his transfer to the federal facilities nor that the state failed to comply with its established criteria for such trans-

**2.** (a) The commissioner may enter into and execute a contract or contracts with the United States for the transfer of any inmate from any facility to a federal correctional facility when, in his opinion, the inmate needs particular treatment or special facilities available at the federal correctional facility; or, all in-state treatment and rehabilitative programs available for the inmate have been *considered and found unsuitable; or*, all in-state security and custody alternatives for the inmate have been considered and found unsuitable; or, the inmate voluntarily requests transfer.

(b) Notwithstanding any other provision of law, an inmate transferred to a federal correctional facility shall, unless otherwise agreed in a contract or contracts, be subject to the same law, rules, regulations, and procedures applicable to inmates committed for violations of laws of the United States, not inconsistent with the sentence imposed. Such laws, rules, regulations, and procedures applicable to Vermont prisoners confined outside Vermont may include but are not limited to matters of discipline, classification, segregation, visiting, mail, clothing or dress, *use of telephones, personal property,* employment, work release, furlough and transfer.

fers. Rather, relying on *Lono v. Fenton,* 581 F.2d 645 (7th Cir. 1978) (*en banc*), plaintiff challenges the authority of the United States to accept him into the federal system.

In entering into the contract with Vermont officials for housing of maximum security prisoners the United States acted pursuant to 18 U.S.C. § 5003(a) which provides:

> The Attorney General, when the Director shall certify that proper and adequate treatment facilities and personnel are available, is hereby authorized to contract with the proper officials of a State or Territory for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such State or Territory . . . . .

The contract merely states in the preamble that "[t]he Director of the Bureau of Prisons has certified that facilities are available at such institution or institutions" for the transfer of "one or more [state] prisoners to one or more Federal institutions, . . . using the facilities and staff available at the institution." Plaintiff claims the contract is defective because it does not indicate that the Director has certified that proper and adequate *treatment* facilities and *personnel* are available within the fed-

eral system and he submits further that, regardless of the validity of the contract, his transfer violates section 5003(a) because there has been no showing or certification that adequate treatment facilities exist *for him* in the federal system.

Plaintiff's position finds support in the majority opinion in *Lono v. Fenton.* There the Seventh Circuit found the language of section 5003(a) to be unambiguous and held that the words "proper and adequate treatment facilities" authorize transfer to the federal system only when the prisoner has some special treatment need with which the state requires assistance and the Director certifies that appropriate specialized treatment facilities are available within the federal system. The majority rely in part upon the act's legislative history to support this conclusion.

■ We are unpersuaded by the majority opinion in *Lono* which is contrary to our observation in *Rebideau* that section 5003 contracts are "predicated on the premise that the transferred inmates would be subject to substantially equivalent treatment and regulations as those confined in Vermont." 398 F.Supp at 812. We prefer to maintain the position we took in *Rebideau* and adopt the reasoning of the *Lono* dissent.[3] We hold, notwithstanding any indi-

---

**3.** There is simply nothing in the language of the statute itself that "restricts or limits the use of Federal prison facilities to those convicted State offenders who are in need of treatment." H.R.Rep.No.1663, 82d Cong., 2d Sess. 2 (1952), U.S.Code Cong. & Admin. News (1952), p. 1421. The majority opinion strains to find such language in the requirement that the Director of the Bureau of Prisons certify that "proper and adequate treatment facilities and personnel" be available. That certification requirement, however, speaks only to the necessity for determining whether appropriate facilities and personnel would be available for handling any prisoners received and cannot reasonably be construed as placing a substantive limitation or restriction on the purposes for which prisoners may be transferred. Those purposes are set out in the statute itself and include simple "care, custody and subsistence," as well as specialized medical treatment and rehabilitative training. I think the language of the statute itself is clear on its face and should control

any seemingly inconsistent legislative history.

Moreover, the apparent discrepancy between the clear language of the statute and its legislative history results from the fact that the committee reports on which *Lono* relies were more concerned with explaining the need for enacting the legislation than the substance of its uncontroversial mechanics. It seems likely that Congress intended the Bureau to have whatever authority it needed to deal with the particular historical problem that prompted the bill's introduction without unduly restricting the Bureau's administrative discretion in determining the types of prisoners it would contract to receive and the purposes for which it might assume federal custody over state prisoners. In any event, the Bureau's administrative construction of the act as not limiting the Bureau to accepting only those prisoners in need of specialized treatment is "entitled to great weight and should be followed unless there are compelling indications that it is wrong." *Old Ben*

cation from the legislative history of the act to the contrary, that the act plainly and unambiguously requires no showing of specialized treatment needs or facilities before a Vermont state prisoner may be transferred to the federal prison system in accordance with the contract under which Howe was so transferred. *Sisbarro v. Warden,* 592 F.2d 1 (1st Cir. 1979); *Fletcher v. Warden,* 467 F.Supp. 777 (D.Kan.1979). In contracting with state officials, 18 U.S.C. § 5003(a) requires nothing more of the Director of the Bureau of Prisons than a certification that facilities exist within the federal system in which state prisoners may be accommodated. That requirement has been met in the case at hand.

We deny the relief requested by plaintiff and enter judgment for defendants.

*Coal Corp. v. Interior Board of Mine Operations Appeals,* 523 F.2d 25, 36 (7th Cir. 1975). The Bureau, after all, itself drafted this statute, prompted its introduction in the Senate, and pressed it through Congress without amendment or, indeed, much debate. Moreover, upsetting the Bureau's settled and previously unchallenged administrative construction of the statute now—over 25 years after its enactment—jeopardizes longstanding contractual relationships with many States.

*Lono v. Fenton,* 581 F.2d at 648–49.