**Robert HOWE, Sr., Plaintiff-Appellant,**

v.

**Benjamin CIVILETTI, Attorney General for the United States, and Norman Carlson, Director of the United States Bureau of Prisons, Defendants-Appellees,**

**Cornelius Hogan, Commissioner of Corrections, State of Vermont, Intervenor.**

**No. 884, Docket 79–2251.**

United States Court of Appeals, Second Circuit.

Argued March 7, 1980.

Decided June 23, 1980.

---

David W. Curtis, Montpelier, Vt., for plaintiff-appellant.

Karen McAndrew, Asst. U. S. Atty., Burlington, Vt. (William B. Gray, U. S. Atty., D. Vt., Rutland, Vt., of counsel), for defendants-appellees.

Peter M. Nowlan, Asst. Atty. Gen., Waterbury, Vt. (Peter B. Brittin, Asst. Atty. Gen., Waterbury, Vt., M. Jerome Diamond, Atty. Gen., Montpelier, Vt., of counsel), for intervenor-appellee.

Before NEWMAN and KEARSE, Circuit Judges, and SIFTON, District Judge.*

SIFTON, District Judge.

Robert Howe, Sr. was convicted of first-degree murder in the state courts of Vermont and on February 2, 1977, was sentenced to a term of life imprisonment. Howe was initially sent to the Vermont Correction and Diagnostic Treatment Facility at St. Albans, Vermont to begin service of his sentence. St. Albans is not equipped to handle maximum security prisoners on a long-term basis and Howe, because of the length of his sentence and the nature of his offense, was appropriately classified as a prisoner requiring maximum security. On February 22, 1977, following an administrative hearing held at St. Albans at which Howe was represented by a non-lawyer of his choosing, Howe was transferred to the custody of the Attorney General of the United States to serve his sentence in a federal correctional institution.

Howe's transfer to the federal correctional system was made pursuant to a 1975 contract between the United States and the State of Vermont, of a type authorized by 18 U.S.C. § 5003, in which the United States agreed to accept up to forty Vermont prisoners in federal institutions.[1] Shortly after entering this 1975 agreement, Vermont, as

---

* Of the Eastern District of New York, sitting by designation.

1. This contract provides in pertinent part:

   "THIS AGREEMENT, entered into between the Government of the United States, hereinafter designated as the Government, pursuant to authority provided in Public Law 333 —82nd Congress (18 U.S.C. § 5003) and the State of Vermont, hereinafter referred to as the State, pursuant to its authority 28 V.S.A. § 706 by their duly authorized officers, WITNESSETH:

   "WHEREAS: The State intends to close its only maximum security prison as a result of this agreement, and

   "WHEREAS: The State has requested permission to transfer one or more prisoners to one or more Federal institutions, hereinafter referred to as the institution, using the facilities and staff available at the institution, and

   "WHEREAS: The Director of the Bureau of Prisons has certified that facilities are available at such institution or institutions,

   "NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

   "1. The Government will undertake the custody, care and treatment, including the furnishings and subsistence and all necessary medical and hospital services and supplies, of State prisoners committed to the Federal institution. . . .

   "2. The State may without prior approval by the Government and without individual application to the Government transfer up to 40 State prisoners for commitment to a Bureau of Prisons facility. If, at the time of a proposed transfer, there are 40 or more State prisoners under contract within the system, the State will submit to the Director of the Bureau of Prisons a separate application for each individual prisoner proposed for transfer to the system."

contemplated in the agreement, closed its only maximum security prison. *See Rebideau v. Stoneman*, 398 F.Supp. 805 (D.Vt. 1975), aff'd, 575 F.2d 31 (2d Cir. 1978) (per curiam). There is currently no state facility in Vermont equipped to handle maximum security prisoners such as Mr. Howe on a long-term basis.

Howe alleges that his transfer to a federal prison was contrary to federal law because the Director of the Bureau of Prisons did not make a determination that Howe was in need of specialized treatment which was available in a federal institution, but was not available in a Vermont prison. Howe alleges that such a finding was required by 18 U.S.C. § 5003.[2]

In support of his argument that Section 5003 requires a finding that a prisoner who is to be transferred is in need of specialized treatment not available in state prisons, Howe relies on *Lono v. Fenton*, 581 F.2d 645 (7th Cir. 1978), a closely divided decision of the Seventh Circuit sitting *en banc* which reversed a decision by a panel of that Circuit. The panel held that no showing of need for specialized treatment was required by Section 5003. The Seventh Circuit decided by a 4–3 margin that it did require such a showing.

The *Lono* holding has subsequently been rejected by a number of courts. *Sisbarro v. Warden*, 592 F.2d 1 (1st Cir. 1979); *Gomes v. Moran*, 468 F.Supp. 542 (D.R.I.1979); *Fletcher v. Warden*, 467 F.Supp. 777 (D.Kan.1979); *Bowers v. Fenton*, 488 F.Supp. 571, (M.D.Pa. Sept. 18, 1979); *Spence v. Fenton*, No. 79–777 (M.D.Pa. Aug. 30, 1979). *Lono* has been followed in only one reported decision—a decision by a district court within the Seventh Circuit which was bound to follow it. *Lawrence v. Elsea*, 478 F.Supp. 480 (W.D.Wis.1979).[3]

In the present case, Judge Coffrin chose to adopt the position of the *Lono* dissent and of the First Circuit in *Sisbarro* that 18 U.S.C. § 5003 requires no showing of specialized treatment needs or the availability of specialized treatment facilities before a state prisoner may be transferred to the federal prison system. 480 F.Supp. at 115. We agree and affirm the decision below.

Howe does not quarrel with respondents' conclusion that the federal government has proper and adequate maximum security prisons and that Vermont does not. He argues, instead, that the references in the statute to "treatment" and to "treatment facilities" were intended by Congress to require a showing that the federal facilities could provide treatment, in the sense of corrective and preventative guidance meeting his particularized needs, and that Vermont must be shown to lack such facilities in order for transfers such as his to be legal.[4]

Nothing at all in the statute's language or in the legislative history suggests that Howe is correct in believing that Vermont

---

**2.** 18 U.S.C. § 5003 provides:

"(a) The Attorney General, when the Director shall certify that proper and adequate treatment facilities and personnel are available, is hereby authorized to contract with the proper officials of a State or Territory for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such State or Territory, Provided, That any such contract shall provide for reimbursing the United States in full for all costs or other expenses involved.

"(b) Funds received under such control may be deposited in the Treasury to the credit of the appropriation or appropriations from which the payments for such service were originally made.

"(c) Unless otherwise specifically provided in the contract, a person committed to the Attorney General hereunder shall be subject to all the provisions of law and regulations applicable to persons committed for violations of laws of the United States not inconsistent with the sentence imposed.

"(d) The term "State" as used in this section includes any State, Territory, or possession of the United States, and the Canal Zone."

**3.** One other court, *in dicta*, has noted the split of authority and indicated a preference for the *Lono* interpretation. *Ali v. Gibson*, 483 F.Supp. 1102 (D.V.I.1979).

**4.** Such a showing might in Howe's case be difficult. Given the nature of his crime and the length of his sentence, it is likely that deterrence rather than hopes of reform provided the basis of his imprisonment.

cannot contract with the federal government for transfer of its prisoners unless it demonstrates that it lacks comparable facilities itself. Nor is there any authority in the case law, including *Lono v. Fenton, supra,* which supports that branch of Howe's argument.

There is also nothing in the language of 18 U.S.C. § 5003 and little in the legislative history to suggest that the propriety and adequacy of the federal government facilities and personnel are to be assessed in terms of the needs of each individual prisoner selected for transfer.[5] Moreover, nothing in *Lono v. Fenton, supra,* nor in any other authority supports an interpretation of the statute as requiring individualized adjudicative determinations.

What caught the attention of the Seventh Circuit in *Lono* was the third aspect of Howe's argument which finds its basis in language of a House Report stating that the federal-state contracts authorized by 18 U.S.C. § 5003 would be legally permissible only for "those convicted state offenders who are in need of treatment."[6] In support of its conclusion that the statute restricts the availability of the transfer provision to prisoners in need of treatment, the Seventh Circuit majority pointed to the fact that what the Director of Prisons must certify is that the federal "treatment facilities" are adequate and proper.

Our reason for rejecting Howe's argument is that it has no basis in the language of the statute. The statute authorizes states to contract not simply for "treatment," but the "custody, care, subsistence, education, treatment and training of persons convicted." Nothing in this grammatical construction gives "treatment" the primacy which Howe contends for, or provides a basis for concluding that, whatever other services are provided, treatment must in all events be furnished prisoners subject to any federal-state contract authorized by the statute.

The issue is, moreover, not simply one of grammar. Adopting Howe's view of the statute would mean that a wholly incorrigible or, on the other hand, fully rehabilitated prisoner, incarcerated not for treatment, but solely for purposes of deterrence, could not be transferred from state to federal custody solely to take advantage of training and educational opportunities available only at federal facilities. Nothing in the legislative history of 18 U.S.C. § 5003 suggests such a distinction between prisoners incarcerated for purposes of reform and those incarcerated for deterrence or other purposes. On the contrary, the somewhat indiscriminate fashion in which the unmet needs of state prisoners are referred to in the legislative history suggests that Congress had no such limited purposes in mind when the legislation was passed.[7]

The fact that the statutory language refers to federal prisons subject to the legislation as "treatment facilities" adds little to the debate. More plausible than the argument that this phrase was intended to limit the use of the statutory program to persons in need of treatment is the explanation that the phrase simply named those institutions

---

5. At most, there are references in the Senate and House Reports to certain categories of cases in which states had previously requested assistance from the federal prison system, notably juveniles and drug addicts. S.Rep. No. 978, 82 Cong., 1st Sess. 2 (1951); H.R. Rep. No. 1663, 82 Cong.2d Sess. 1 (1952), reprinted in [1952] U.S. Code Cong. & Admin. News, pp. 1420, 1421.

6. The Report contains the following in its discussion of the "Contents" of the bill:
   "The proposed legislation restricts or limits the use of federal prison facilities to those convicted state offenders who are in need of treatment. The term 'treatment' as used in this bill, in addition to its ordinary meaning of medical care, is also meant to include corrective or preventive guidance and training as defined in the Youth Corrections Act (*see* 5006g, Title 18, U.S.C.)." H.R. Rep. No. 1663 at 2, *supra,* U.S. Code Cong. & Admin. News 1952 at 1421.

7. Thus, the Department of Justice's justification for the legislation it drafted referred to state requests for the federal prison system to undertake "custody, treatment and training," of state prisons "where specialized types of institutions and trainings are indicated but not available to the states." S.Rep. No. 978, 82 Cong., 1st Sess. 2 (1951).

in terms of the most laudable (if, perhaps, least often realized) goal the institutions serve, namely, the reform of prisoners through treatment.

While the passage of the House Report quoted above, indeed, suggests a more limited intention for the legislation, at least in the minds of the draftsmen of the House Report, what was voted on, without relevant amendment or debate by both Houses of Congress was, of course, the statutory language, and not the House Report. 97 Cong.Rec. 13543 (1951) (Senate); 98 Cong. Rec. 4801 (1952). Indeed, the House Report was published after passage of the Senate Bill and nothing comparable appears to have been part of the legislative history of the Bill before the Senate. *See* S.Rep. No. 978, 82 Cong., 1st Sess. (1951).

In such circumstances, one must take the statutory language, if not quite at face value, at least with the values and construction put upon it by those in the administrative agencies, both federal and state, to whom such words as "custody, care, subsistence, education, treatment, and training" come freighted with concrete meaning, and for whom treatment appears as only one of the several goals which may be served by incarceration and only one of the purposes the statute was intended to serve. Construction of a statute by those charged with its execution should, of course, be followed unless there are compelling indications that it is wrong. *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). No such indications appear here.

The judgment of the district court is affirmed.