**Arthur Joseph BESHAW, Appellant,**

v.

**Charles FENTON, Warden U. S. Penitentiary et al.**

**No. 79–1777.**

United States Court of Appeals, Third Circuit.

Argued Oct. 6, 1980.

Decided Dec. 15, 1980.

Warren R. Baldys, Jr., Karl K. Baldys (argued), Baldys & Baldys, Williamsport, Pa., for appellant.

Carlon M. O'Malley, Jr., U. S. Atty., Joseph F. Cimini (argued), Asst. U. S. Atty., Scranton, Pa., for appellee.

Before SEITZ, Chief Judge, ADAMS and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In this appeal, a prisoner convicted in a state court and originally incarcerated in a state prison challenges his transfer to federal custody on the ground that the applicable federal statute did not authorize it, and on the further ground that the hearing preceding the transfer was inadequate.

*FACTS*:

Arthur Beshaw was convicted in the Vermont state courts for the crime of breaking and entering, and at a later trial of attempted escape and related charges. He was sentenced to a total of twenty–two years, six months and twenty–four days in prison. Originally, Beshaw was confined in Vermont's maximum security prison at Windsor, Vermont. When Vermont decided to phase out its 175–year old Windsor facility, the Vermont Department of Corrections contracted with the Federal Bureau of Prisons to transfer to federal custody those state prisoners who could not be accommodated at other state institutions. Pursuant to this agreement, Beshaw was sent to the Federal Correctional Institution at Petersburg, Virginia. Before he was transferred, Beshaw was given a pre-transfer hearing by the Vermont Department of Corrections.

For disciplinary and security reasons, Beshaw was subsequently moved to federal facilities in Wisconsin, Illinois, Pennsylvania, and Indiana. On June 11, 1980, Beshaw was transferred to the Massachusetts

Correctional Institution, Walpole, Massachusetts. The shift to the Massachusetts institution was made in accordance with an agreement between the Federal Bureau of Prisons and the State of Massachusetts authorizing the transfer of federal prisoners to Massachusetts state facilities.

In January 1979, while confined in the federal penitentiary at Lewisburg, Pennsylvania, Beshaw filed a petition for a writ of habeas corpus with the District Court for the Middle District of Pennsylvania. Beshaw challenged his move from the Vermont prison system to federal custody, on the ground that this transfer was not authorized by federal statute. Beshaw also averred that the pre–transfer hearing accorded him by the Vermont Department of Corrections was inadequate to satisfy the requirements of due process.

On January 24, 1979, the United States Magistrate issued a report recommending that the writ be denied. He found that Beshaw's transfer was lawful and involved an "administrative matter best left to the discretion of prison officials rather than the courts." This report was adopted by the district judge, who, on February 9, 1979 issued an order denying the writ. A notice of appeal was filed from the district court's

decision on February 22. On March 7, the district court certified that the appeal was not being taken in good faith. This Court, however, issued a certificate of probable cause on June 7, 1979, and the appeal was docketed.[1]

## DISCUSSION:

### A. Mootness

Because Beshaw is presently confined at a Massachusetts state facility, we must consider initially whether his challenge to the transfer from a Vermont state institution to federal prison is moot. In *Preiser v. Newkirk*, 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 319 (1975), the Supreme Court ruled that a prisoner's challenge to a transfer from a New York state medium security prison was rendered moot by his retransfer to a minimum security prison within New York and by the fact that he would be eligible for parole in a short time. The Court determined that there was no reasonable expectation that the wrong would be repeated, and that the questions presented did not fall within that category of harm capable of repetition yet evading review.

We find the case at hand distinguishable from *Preiser*. While Beshaw is no longer in federal custody,[2] his transfer from a federal

---

1. Oral argument in this case was not heard until October 6, 1980. The unusually long delay between the docketing of the appeal and oral argument resulted from the failure of the government to file a timely brief. Beshaw's brief was received and filed in this Court on October 4, 1979. Although Warden Fenton was purportedly served by certified mail with a copy of Beshaw's brief, no brief on behalf of Warden Fenton had been received by this Court as of February 22, 1980. At that time the warden was informed that the case would be listed for disposition on appellant's brief only, unless a brief on his behalf was filed within thirty days. The government subsequently moved for and was granted leave to file its brief out of time; the government's brief was received by the Court on September 2, 1980.

   Such long delays between the taking of an appeal and its final disposition are particularly regrettable when the rights of the imprisoned are at issue.

2. Although we refer throughout this opinion to Beshaw's having been in "federal custody" while confined at federal correctional institu-

tions, and in "state custody" while confined in the state prisons of Vermont and Massachusetts, the use of this terminology might be questioned. In *United States v. Thompson*, 562 F.2d 232 (3d Cir. 1977) (en banc), Judge Garth observed that determining who has "custody" of a particular prisoner often "will raise questions of metaphysical subtlety." Among the examples he provided was the situation presented in this case: "In whose 'custody' is a person who has been convicted of state offenses but who is confined in a federal facility pursuant to a contract between the respective jurisdictions? Under 18 U.S.C. § 5003(a), the 'custody,' care etc. of such persons is committed to the Attorney General of the United States. But I would suspect that most states would regard all persons imprisoned for state offenses as being in state 'custody.'" *Id.* at 241 42 (Garth, J., dissenting).

   Ascertaining whether Beshaw was in state or federal custody after his transfer to federal prison might appear to be of more than academic interest. Beshaw's petition for a writ of habeas corpus was made pursuant to 28 U.S.C. § 2241 rather than 28 U.S.C. § 2254, and was

prison system to the Massachusetts state was made pursuant to an agreement between the Federal Bureau of Prisons and the State of Massachusetts. The State of Vermont is not a party to that agreement, although Vermont officials were consulted before Beshaw was transferred into Massachusetts custody. Beshaw's present confinement in Massachusetts is thus a consequence of the transfer from Vermont to federal custody, the very transfer that he attacks, and there is no indication in the record that Beshaw's present confinement in Massachusetts could have come about had he not been transferred first to federal custody in the way he claims was unlawful.

In addition, federal officials retain discretion to return Beshaw to federal custody. Unlike *Preiser*, there is in the present situation a distinct possibility that Beshaw will once again suffer the "wrong" of which he complains, namely, transfer to a federal facility. Counsel for the government stated at oral argument that Beshaw would likely be moved to a federal institution if a position at a suitable facility became available. In light of these circumstances, we find that Beshaw's claim is still alive and that

his appeal is not moot. *Cf. Ali v. Gibson,* 631 F.2d 1126 (3d Cir. 1980) (challenge to conditions of confinement at federal prison from which petitioner had been transferred not moot, since it was likely that petitioner would be transferred back to federal prison).

B. *The Lawfulness of Beshaw's Transfer into Federal Custody*

■ Beshaw's principal contention is that his movement from the Vermont prison system into federal custody was without statutory authority under 18 U.S.C. § 5003, the provision governing transfers of state prisoners to federal control. Section 5003 provides in pertinent part:

> The Attorney General, when the Director [of the Federal Bureau of Prisons] shall certify that proper and adequate treatment facilities and personnel are available, is hereby authorized to contract with the proper officials of a State or Territory for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such State or Territory.

filed while Beshaw was confined in the federal prison at Lewisburg, Pennsylvania. If, however, Beshaw was in state custody at the time of filing, it is arguable that he should have petitioned the court pursuant to § 2254, and would have been subject to that section's requirement of exhaustion of state remedies. There is no indication in the record that Beshaw has presented his federal claims to a Vermont state tribunal.

The few cases that have considered the question have held that a prisoner confined in federal prison pursuant to a § 5003 transfer remains in "state custody" and cannot avail himself of habeas corpus relief absent proof that he has exhausted state remedies. *See Stearns v. Parker,* 469 F.2d 1090 (9th Cir. 1972).

We need not decide, however, whether Beshaw's confinement is more appropriately characterized as state or federal. The exhaustion requirement of § 2254 is not a jurisdictional prerequisite, and courts may deviate from it in those cases where justice so requires. *Ballard v. Maggio,* 544 F.2d 1247 (5th Cir. 1977); *U. S. ex rel. Graham v. Mancusi,* 457 F.2d 463 (2d Cir. 1972); *U. S. ex rel. Speaks v. Brierley,* 417 F.2d 597 (3d Cir. 1969), *cert. denied,* 397 U.S. 1051, 90 S.Ct. 1388, 25 L.Ed.2d 665 (1970). Even assuming that Beshaw was in state custo-

dy at the time he filed his petition, the circumstances of this case suggest that discretionary suspension of the exhaustion requirement would be appropriate. Beshaw's appeal has been before this Court for over one year, because of the failure of the government to file a timely brief, *see* note 1 *supra,* and imposition of an exhaustion requirement at this juncture would delay further the adjudication of his claims. In addition, we note that the government has not objected to federal jurisdiction on the ground that Beshaw has failed to exhaust state remedies.

Moreover, the comity considerations underlying the exhaustion requirement, *see U. S. ex rel. Speaks v. Brierley,* 417 F.2d 597, 599–600 (3d Cir. 1969); *Gockley v. Meyers,* 411 F.2d 216 (3d Cir. 1969), are not applicable to the present appeal. Beshaw does not assert error in his state court trial that would best be directed first to the state court system for an opportunity to consider the issue. Instead, Beshaw objects to a transfer from state to federal custody–a transfer in which federal as well as state officials had a hand. Under the circumstances of this case, it does not demean the integrity of the Vermont state courts for Beshaw's federal law claim to be heard as an initial matter in federal court.

Beshaw maintains that the statute authorizes the transfer of state prisoners only in those instances where specialized treatment is required and is available at federal, but not at state, institutions. Since his transfer was not for treatment purposes, Beshaw argues that it was not authorized by Section 5003, and that he should be returned to the custody of Vermont state officials.

The federal courts of appeals have divided in their interpretation of Section 5003. In *Lono v. Fenton*, 581 F.2d 645 (7th Cir. 1978) (en banc), the Seventh Circuit, by a 4–3 vote, held that the authority of federal officials to accept a state prisoner pursuant to Section 5003 is conditioned on a showing that the prisoner is in need of specialized treatment available only in the federal correctional system. The court noted that Section 5003 refers to the availability of "proper and adequate *treatment* facilities and personnel," and concluded that "it necessarily follows that the only authorized purpose for any transfer is the provision of specialized treatment." *Id.* at 647. The Seventh Circuit also observed that the other federal statutes relating to prisons generally refer to these institutions as "penal and correctional institutions" rather than "treatment facilities." *See, e. g.*, 18 U.S.C. § 4001(b)(1) (1976); *id.* § 4081. In reaching its conclusion, the Seventh Circuit commented that "[w]e do not believe Section 5003 to be ambiguous." 581 F.2d at 647.

In *Howe v. Civiletti*, 625 F.2d 454 (2d Cir. 1980), the Second Circuit also considered the language of Section 5003 to be unambiguous,[3] but found it precluded the interpretation adopted by the Seventh Circuit in *Lono*

*v. Fenton.* The Second Circuit was confronted in *Howe* with the precise issue presented in Beshaw's case: the legality under Section 5003 of the transfer of a Vermont state prisoner to federal custody pursuant to the agreement between Vermont and the Federal Bureau of Prisons, where it was not determined before transfer that the prisoner was in need of specialized treatment. In rejecting the argument that the statute's reference to "treatment facilities and personnel" was meant to foreclose transfers for purposes other than treatment, the Second Circuit declared: "More plausible than the argument that this phrase was intended to limit the use of the statutory program to persons in need of treatment is the explanation that the phrase simply names those institutions in terms of the most laudable (if, perhaps, least often realized) goal the institutions serve, namely, the reform of prisoners through treatment." 625 F.2d at 457–58. Other federal courts have concurred with the Second Circuit in interpreting Section 5003 as authorizing transfers from state to federal custody even when the transferred prisoner does not require special treatment available only at federal facilities.[4]

We find that the language of Section 5003, construed in light of the legislative history of the provision is best understood as not requiring a showing of need for specialized treatment before a transfer from state to federal custody may be authorized. The statute provides that the Attorney General can contract with appropriate representatives of the States "for the custody, care, subsistence, education, treatment, and training" of convicted persons. The

---

3. "Our basis for rejecting Howe's argument [that Section 5003 restricts the availability of transfer to prisoners in need of treatment] is that it has no basis in the language of the statute." *Howe v. Civiletti*, 625 F.2d at 457.

4. *E. g., Sisbarro v. Warden*, 592 F.2d 1 (1st Cir. 1979); *Bowers v. Fenton*, 488 F.Supp. 570 (M.D.Pa.1979); *Fletcher v. Warden*, 467 F.Supp. 777 (D.Kan.1979). No case has been brought to our attention from outside the Seventh Circuit which follows *Lono v. Fenton*.

The acceptance by both the First and Second Circuits of the interpretation of Section 5003 adopted in *Howe* presents a dilemma for Besh-

aw. Were this Court to adopt the statutory construction he urges, and to remand to the district court, that court would likely be confronted with a motion under 28 U.S.C. § 1404(a) for transfer of the case either to Vermont, where Beshaw was convicted, or to Massachusetts, where he is presently confined. The district courts in either state would presumably be bound by the construction of Section 5003 adopted by their respective courts of appeal, and thus would be compelled to deny Beshaw the transfer back to Vermont state custody which he seeks.

purposes of the statute appear to include care, custody, subsistence, education and training as well as treatment, and we do not believe that this statutory language can fairly be read as requiring that any one of these purposes must be applicable to every case. While Section 5003 also states that transfers can take place only when the Director of the Bureau of Prisons certifies that "proper and adequate treatment facilities and personnel are available," we doubt that this clause can be interpreted as requiring any more than that federal facilities and personnel be adequate to handle any prisoners received; we do not find that it places a substantive restriction on the purposes for which prisoners may be transferred. *See Lono v. Fenton,* 581 F.2d at 649 (Bauer, J., dissenting).

The legislative history of Section 5003 suggests that Congress did not intend to authorize only those transfers prompted by a need for specialized treatment. When Section 5003 was enacted in 1952, the Attorney General had already been authorized by statute to contract with state officials for the care of *federal* prisoners by the states. 18 U.S.C. § 4002 (originally enacted in 1930). State prisons for many years housed and cared for federal prisoners–until the federal government built its own institutions. *See* H.R.Rep.No.1663, 82d Cong., 2d Sess. 2 (1952).

By 1952, enough federal facilities had been constructed that Congress believed that the federal government could now accommodate the states in the same manner that the states had previously accommodated the federal government. This sentiment was expressed in a letter to the Congress from Peyton Ford, then Deputy Attorney General, which forms part of both the Senate Report, S.Rep.No.978, 82d Cong., 1st Sess. (1951), and the House Report, H.R. Rep.No.1663, 82d Cong., 2d Sess. (1952), on Section 5003: "Section 4002 of title 18, United States Code, authorizes contracts

with the proper authorities of States, Territories, or political subdivisions thereof, for the imprisonment, subsistence, care, and proper employment of Federal prisoners. Pursuant to the authority of that section, there are approximately 3,000 Federal prisoners serving short sentences or awaiting trial in State, county, and city institutions. . . . There is no apparent reason why the Federal facilities and personnel, if available, should not be made available for State offenders, provided, of course, that the Federal government is reimbursed for any expenses involved." Section 4002 does not preclude transfers of federal prisoners for purposes other than treatment,[5] and we doubt that Section 5003, authorizing transfers of state rather than federal prisoners, can be so limited.

Beshaw points to the following language of the House Report as evidencing an intent to restrict the scope of Section 5003: "The proposed legislation restricts or limits the use of Federal prison facilities to those convicted State offenders who are in need of treatment." H.R.Rep.No.1663, *supra,* at 2.

While this passage would appear facially to support Beshaw's interpretation of Section 5003, we do not find it controlling. The House Report was published on March 27, 1952, five months after Section 5003 had already been passed by the Senate. *See* 97 Cong.Rec. 13543 (Oct. 19, 1951). No language similar to that which appears in the House Report is contained in the Senate Report. We believe that the more restrictive view of the bill represented by the quoted portion of the House Report cannot override the language of the statute itself as enacted by both Houses of Congress–language that authorizes transfers not merely for treatment, but for "custody, care, subsistence, education, treatment, and training."

As the contract between the Federal Bureau of Prisons and the State of Vermont illustrates, the Bureau has not construed

---

**5.** 18 U.S.C. § 4002 provides in pertinent part: "For the purpose of providing suitable quarters for the safekeeping, care, and subsistence of all persons held under authority of any enactment of Congress, the Director of the Bureau of Pris-

ons may contract, for a period not exceeding three years, with the proper authorities of any State, Territory, or political subdivision thereof, for the imprisonment, subsistence, care, and proper employment of such persons."

Section 5003 as limiting the Bureau to accepting only those prisoners in need of specialized treatment. Inasmuch as the Bureau is the agency charged with the administration of the statute, its interpretation is entitled to considerable weight. *See United States v. National Association of Securities Dealers*, 422 U.S. 694, 718–19, 95 S.Ct. 2427, 2442–2443, 45 L.Ed.2d 486 (1975); *NLRB v. Bell Aerospace*, 416 U.S. 267, 274–75, 94 S.Ct. 1757, 1761–1762, 40 L.Ed.2d 134 (1974); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792–801, 13 L.Ed.2d 616 (1964). In this case, moreover, the administrative interpretation of the Bureau is especially deserving of deference by the courts since it was the Bureau which drafted Section 5003, prompted its introduction in the Senate, and pressed it through Congress without relevant amendment or even much debate. *See Lono v. Fenton*, 581 F.2d at 649 (Bauer, J., dissenting).

We also note that Congress has had ample opportunity to express any dissatisfaction it might entertain regarding the Bureau's implementation of Section 5003. If its views were at odds with the construction given the statute by the Bureau of Prisons, Congress could be expected to have made some changes in the statutory language over the intervening quarter of a century since its passage.[6] *See Fletcher v. Warden*, 467 F.Supp. 777, 781 (D.Kan.1979).

Practical considerations also weigh in favor of the Bureau's interpretation of Section 5003. The Second Circuit observed in *Howe v. Civiletti, supra,* that a narrow construction of Section 5003 might work to the disadvantage of some prisoners: "Howe's view of the statute would mean that a wholly incorrigible, or on the other hand, fully rehabilitated prisoner, incarcerated not for treatment, but solely for purposes of deterrence, could not be transferred from state to federal custody solely to take advantage of training and educational oppor-

tunities available only at federal facilities." 625 F.2d at 457. Moreover, the interpretation urged by Beshaw would jeopardize longstanding contractual relationships between the Bureau and many states, and would occasion significant burdens for at least some states. After entering into an agreement with the Federal Bureau of Prisons in 1975, Vermont closed its only maximum security prison. To order that Beshaw be returned to state custody would, in effect, compel Vermont to reopen a state facility for maximum security prisoners or perhaps to build a completely new facility. In the absence of a clear legislative mandate, we are reluctant to render a decision that would so greatly interfere with a state's administration of its own correctional institutions.

We conclude that neither the statutory language nor the legislative history of Section 5003 compels an interpretation that would tolerate the transfer of a state prisoner into federal custody only when the prisoner is in need of specialized treatment. Were we to accept the interpretation urged by Beshaw, we would thereby upset the construction adopted by the Federal Bureau of Prisons, left untouched by Congress, and supported by practical considerations.

## C. *Due Process*

■ Before his transfer to federal custody, Beshaw was given a hearing before the Vermont Board of Corrections. Beshaw contends, however, that this hearing was inadequate to satisfy the requirements of due process because it did not "consider the impact of this transfer on [Beshaw] but [was] limited to security considerations created by the closing of the state's sole maximum security facility at Windsor, Vermont." Beshaw's principal complaint about the pre–transfer hearing–that there was no showing that Beshaw was in need of specialized treatment available only at federal

6. Congress has altered § 5003 in other respects: in 1965 the section was amended to define "State" as including "any State, territory, or possession of the United States, and the Canal Zone." Pub.L.No. 89–267, § 1, 79 Stat. 990 (1965). The failure of Congress to alter the prerequisites for transfer is thus particularly

telling. *See Saxbe v. Bustos*, 419 U.S. 65, 74, 95 S.Ct. 272, 280, 42 L.Ed.2d 231 (1974) ("This longstanding administrative construction is entitled to great weight, particularly when, as here, Congress has revisited the Act and left the practice untouched.")

facilities–is obviously foreclosed by the preceding discussion of Section 5003.

Beshaw also asserts that, as a result of his transfer into federal custody, liberty interests protected by the Fourteenth Amendment were infringed in that he was subjected to a set of prison rules and regulations different from those in effect in the Vermont State prisons, and was transferred a considerable distance from friends and family. He argues that the pre–transfer hearing was constitutionally inadequate because it did not consider the effect a transfer would have on these protected interests.

In light of *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), we conclude that there is no merit to Beshaw's claim that his subjection to a set of prison rules different from those in effect in Vermont implicates a protected liberty interest. In *Meachum*, the Court said: "We cannot agree that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause.... That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules." *Id.* at 224–25, 96 S.Ct. at 2538–2539. The Court declared that a due process liberty interest would be implicated only if state law provided the prisoner with an "entitlement" to remain in the prison to which he was assigned, defeasible only upon proof of specific acts of misconduct or the occurrence of other specific events. In the present case, Beshaw identifies no provision of state or federal law that confers on him an "entitlement" to remain in conditions of confinement substantially similar to those to which he was subject while incarcerated in Vermont. Absent such an entitlement, we are compelled to conclude that Beshaw's transfer to

prisons where the applicable rules and regulations may have been less agreeable to him did not implicate a Fourteenth Amendment liberty interest.

■ Beshaw contends as well that his transfer to federal authority resulted in his being sent great distances from family and friends. Although we are concerned when prisoners are transferred under such circumstances, we are aware of no authority suggesting that a transfer to a facility not easily accessible to a prisoner's relatives and acquaintances necessarily implicates liberty interests protected by the Due Process Clause. No argument has been made, for example, that separation from family and friends constitutes a violation of the Eighth Amendment's prohibition against cruel and unusual punishment; nor has Beshaw pointed to any provision of Vermont law indicating that prisoners sentenced by Vermont courts are entitled not to be transferred considerable distances from their place of original confinement.[7]

In the absence of any entitlement under either federal or state law, we are compelled by *Meachum* to find that Beshaw has not asserted a violation of a protected liberty interest. We note as well that the other federal courts that have considered the question found that a prisoner's due process rights are not implicated simply because he is transferred a considerable distance from his place of original incarceration. *See Ali v. Gibson*, 631 F.2d 1126 (3d Cir. 1980) (transfer from Virgin Islands to mainland United States); *Fletcher v. Warden*, 467 F.Supp. 777 (D.Kan.1979) (transfer from Delaware to Kansas); *Shakur v. Bell*, 447 F.Supp. 958 (S.D.N.Y.1978) (transfer from New Jersey to West Virginia).

### D. *Access to State Courts*

Beshaw asserts that, by virtue of his transfer from Vermont, he has been denied

---

**7.** Beshaw does have a right under Vermont law not to be transferred to a federal facility, however near it might be to his place of original confinement, unless at least one of three conditions is satisfied: (1) the prisoner needs particular treatment or special facilities available at the federal correctional facility; (2) all in–state security and custody alternatives for the inmate have been considered and found wanting; or (3) the inmate voluntarily requests transfer. 28 V.S.A. § 706(a); *see Girouard v. Hogan*, 135 Vt. 448, 378 A.2d 105 (Sup.Ct.1977). At the pre–transfer hearing accorded Beshaw, it was determined that he was subject to transfer under condition (2). Beshaw does not challenge the validity of his transfer under state law.

access to the Vermont courts. This contention was originally raised in Beshaw's objections to the magistrates' report, wherein he maintained that he had no access to Vermont statutes, digests, or Supreme Court decisions, and that he was consequently disadvantaged in attempts to litigate his claims in Vermont courts. The district court did not address this issue in its order denying the petition for a writ of habeas corpus.

Like all prisoners, Beshaw has a constitutional right of access to the courts. The Supreme Court, which has recognized such a right at least since *Ex parte Hull*, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), has required that access to the courts for criminal defendants be adequate, effective, and meaningful, *see Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1950). In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court considered whether the availability of legal materials was a component of the right of access to the courts. It held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 827, 97 S.Ct. at 1497–1498.

The posture of the present case precludes us from deciding whether Beshaw's right to access has been abridged.[8] The district court made no findings on this issue. In his brief, Beshaw does no more than state in a conclusory fashion that, because of his transfers, "[h]e is under a disability ... with regard to access to the state courts and an attorney familiar with Vermont law." Brief at 12. But we are given no indication of the manner in which Beshaw's

rights have purportedly been abridged; we are not told, for instance, whether he is currently without access to sources of Vermont law, whether he is denied all access to Vermont counsel, or even whether he is pursuing, or wishes to pursue, an appeal through the Vermont state courts.

In *Hohman v. Hogan*, 458 F.Supp. 669 (D.Vt.1978), the district court considered a claim of denial of access raised by a prisoner who had been convicted in Vermont but transferred pursuant to § 5003 to the United States Federal Penitentiary at Marion, Illinois. The court there ascertained that the facilities and programs available to the plaintiff were adequate to protect his right of access to the courts. Of particular significance were the services of the Vermont Public Defender. State prisoners in federal custody maintained communication with the Defender General's office by mail, limited telephone calls, and infrequent personal conferences. In addition, it was the practice and policy of the Vermont Department of Corrections, when time and other circumstances allowed, to return to Vermont prisoners who had been transferred to the federal prison system, when their presence was required in court proceedings. Pursuant to this policy, the plaintiff in *Hohman* had been returned to Vermont to consult with his counsel on his appeal to the Vermont Supreme Court. Although the library of the federal facility at Marion did not contain Vermont statutes or reporters, these materials were made available by the Vermont Law and Documents Library in Montpelier, Vermont, which conducted a program through which Vermont prisoners could obtain free legal materials wherever they were incarcerated.

There is in the record in the present case no indication whether the services made available by Vermont at the time of *Hohman* are still available to prisoners incarcer-

---

**8.** It is unclear from the record just what claim Beshaw is making with respect to the right of access. In his objections to the magistrate's findings, denial of the right of access is listed as an independent ground for granting habeas corpus relief. In Beshaw's brief, however, denial of the right of access is mentioned in connection with the asserted violations of due process.

Beshaw thus appears to be claiming that the effect of the transfer on his access to the courts should have been considered at a hearing before he was placed in federal custody. Regardless of how the objection is framed, however, the record before us is insufficient for us to render a decision on the merits.

ated out–of–state. Nor is there any basis on which we can properly determine whether, if available, these services would be adequate to ensure that a prisoner with Beshaw's particular needs would have meaningful access to the courts of Vermont. Under these circumstances, we cannot say that the writ of habeas corpus should issue on grounds that Beshaw's right to access has been violated. In so deciding, however, we do not mean to prejudice any future efforts by Beshaw to seek relief on these grounds.

CONCLUSION:

The judgment of the district court denying Beshaw's petition for a writ of habeas corpus will be affirmed.