637 F.2d 1130
 Dennis Ray ANTHONY, Petitioner-Appellee,
v.
George C. WILKINSON, Warden, U. S. Penitentiary, Marion,
Ill., Helene Beirne, Alaska Commissioner of Health & Social
Services, and the Attorney General of the State of Alaska,
Respondents-Appellants.
Roy J. GIROUARD, John H. Killary and John E. Kasper,
Petitioners-Appellees,
v.
George C. WILKINSON, Warden, et al., Respondents-Appellants,
Cornelius D. Hogan, Intervening Respondent.
Aubrey McKAY, Carl Vincent Henry, William K. Mederios, Peter
M. K. Lono, Donald A. Morgan, George Shimabuku,
and Leo McGill, Petitioners-Appellees,
v.
George C. WILKINSON, Warden, Respondent-Appellant.
Herbert William LAWRENCE, Petitioner-Appellee,
v.
Robert I. ELSEA, Warden, Respondent,
Cornelius D. Hogan, Intervening Respondent-Appellant.
Roy J. GIROUARD, John H. Killary, John E. Kasper, Carl
Vincent Henry, Aubrey McKay, Donald A. Morgan,
William K. Mederios, Peter M. K. Lono
and George Shimabuku,
Petitioners-Appellees,
v.
George C. WILKINSON, Warden, et al., Respondents,
Cornelius D. Hogan, State of Delaware, State of Alaska, and
State of Hawaii, Intervening Respondents-Appellants.
Herbert William LAWRENCE, Petitioner-Appellee,
v.
Robert I. ELSEA, Warden, Respondent-Appellant,
Cornelius D. Hogan, Intervening Respondent.
 Nos. 79-2362, 79-2488, 79-2361, 79-2363, 79-2369, 79-2364,
79-2365, 79-2366, 79-2367, 79-2368, 79-2370, 79-2371,
79-2374, 79-2410, 79-2411, 79-2412, 79- 2485, 79-2486,
79-2487, 79-2531, 79-2532, 79-2533 and 79-2567.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 16, 1980.
Decided Dec. 23, 1980.
Rehearing Denied February 27, 1981.
 
 Mary B. Beauparlant, Asst. U. S. Atty., East St. Louis, Ill., for respondents-appellants.
 Michael Lilly, Sp. Deputy Atty. Gen., San Jose, Cal., John A. Parkins, Del. Dept. of Justice, Wilmington, Del., Dean Guanelai, Asst. Atty. Gen., Juneau, Alaska, Peter Nowlan, Asst. Atty. Gen., Dept. of Corrections, Waterbury, Vt., for intervening respondent.
 Michael B. Nash, William J. Linklater, Chicago, Ill., for petitioners-appellees.
 Before SWYGERT, PELL and CUDAHY, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 Pursuant to 28 U.S.C. § 2241, twelve petitioner-appellees filed petitions for writs of habeas corpus alleging that their transfers from state to federal prisons because of insufficient state maximum security facilities were invalid under 18 U.S.C. § 5003(a), as construed by Lono v. Fenton, 581 F.2d 645 (7th Cir. 1978) (en banc) ("Lono").[1] They sought release from federal custody and return to prisons in their respective states of conviction. Upon recommendation of a magistrate, the District Court for the Southern District of Illinois granted the petitions of the eleven prisoners who, at the time of filing, were incarcerated at the U.S. Penitentiary in Marion, Illinois ("Marion Penitentiary"). The District Court for the Western District of Wisconsin granted the petition of the one petitioner who, at the time of filing, was incarcerated at the Federal Correctional Institution in Oxford, Wisconsin ("Oxford FCI"). Federal and state government respondents and intervenors appealed.
 
 
 2
 In Lono, we held that section 5003 conditions the authority of federal officials to accept state prisoners into custody on a showing that the prisoners are in need of specialized treatment available only in the federal system. On appeal, the government parties argue that the transfers of these prisoners because of the unavailability of state maximum security facilities qualify as transfers for specialized treatment and that the procedures heretofore employed in making the transfer decisions were sufficient to satisfy petitioners' due process rights. We generally agree with the government parties that there may be instances in which conditions at federal maximum security facilities may constitute specialized treatment; however, because we find that in these particular cases the United States Bureau of Prisons (the "Bureau") and the states gave inadequate consideration to satisfaction of the Lono criteria prior to transfer and because the transfer evaluation procedures did not comport with due process requirements, we affirm.
 
 I.
 
 3
 Following their convictions and incarceration for various offenses in five different states Vermont, Alaska, Hawaii, New Mexico and Delaware the twelve petitioners were transferred from state to federal custody pursuant to contracts between their states of origin and the Bureau as purportedly authorized by 18 U.S.C. § 5003(a).[2] All of the petitioners allegedly require for their own benefit and for the benefit of society maximum security incarceration, which for one reason or another is not available in their states of origin.[3]
 
 
 4
 In the case of the four petitioners transferred from the state of Vermont, state corrections department hearing officers conducted proceedings prior to the petitioners' transfer to determine if the criteria established by the state's transfer policy were satisfied.[4] The terms of this policy do not require a determination whether petitioners are in need of specialized treatment or if such treatment facilities are available in the federal prison system.[5] Two of the three petitioners transferred from Hawaii were afforded state-conducted pre-transfer hearings; again, however, these proceedings did not consider the need for specialized treatment.[6] The two petitioners from Alaska received pre-transfer meetings or hearings.[7] These also did not evaluate the petitioners' need for specialized treatment nor the availability of such treatment facilities in the federal system. Neither one of the two petitioners from Delaware[8] nor the petitioner from New Mexico[9] received pretransfer hearings regarding their move from state to federal custody.
 
 
 5
 The eleven petitioners who were incarcerated at Marion Penitentiary at the time they filed their petitions in the District Court for the Southern District of Illinois received individual hearings before the United States Magistrate.[10] The magistrate consolidated the cases for purposes of his Report and Recommendation. Since the magistrate found that the requirement of Lono, that a showing of need for specialized treatment must be made prior to transfer of prisoners from state to federal custody, had not been satisfied, he recommended that their petitions be granted. See McKay v. Wilkinson, No. CV 79-2038 (S.D.Ill., Magistrate Meyers, Sept. 28, 1979). The District Court for the Southern District of Illinois (Foreman, J.) adopted the magistrate's recommendation and required that the Marion petitioners be returned to their respective state correctional systems within thirty days. See McKay v. Wilkinson, No. CV 79-2038 (S.D.Ill. Nov. 2, 1979). Both the magistrate and the district court expressed their disapproval of the Lono decision, which, they conceded, controls the instant petitions and requires that they be granted. The district court stayed its order pending appeal.
 
 
 6
 At the time of filing his petition, petitioner Lawrence was confined at Oxford FCI. He brought his petition in the District Court for the Western District of Wisconsin, where, on the authority of Lono, Judge Doyle granted it without an evidentiary hearing.[11] The court's order required that petitioner Lawrence be returned to Vermont correctional facilities within thirty days. See Lawrence v. Elsea, 478 F.Supp. 480 (W.D.Wis.1979). The district court denied the state intervenor's motion to stay the order, but on appeal, we granted the motion to stay.
 
 II.
 
 7
 Our decision in Lono forms the primary basis for petitioners' claim for relief. Essentially, petitioners argue that since they did not receive a pre-transfer hearing on their need for specialized treatment and on the possibility of satisfaction of that need in the federal system, their transfers were illegal. In opposition, the federal and state respondents and intervenors take several alternative positions regarding the force of the Lono decision. They argue first that this panel should overrule the court's en banc decision in Lono rendered only a little more than two years ago, and second, that the instant cases are distinguishable from Lono.
 
 
 8
 In Lono, the petitioner, convicted of murder and armed robbery, was incarcerated in Hawaiian state facilities. In 1967, he was transferred to the U.S. Penitentiary, Leavenworth, Kansas, pursuant to a federal-state contract purportedly authorized by 18 U.S.C. § 5003. Two years later, he was transferred to Marion Penitentiary. Pursuant to 28 U.S.C. § 2241, Lono filed a petition for habeas corpus in the District Court for the Eastern District of Illinois. The parties stipulated that Lono had never received any hearing on, or a statement of reasons for, his transfer from the state to the federal prison system. Lono contended that because of his transfer to federal prisons in the continental United States he had been unable to see any of his friends or family for over ten years and that he had been unable to communicate with counsel familiar with Hawaiian law so that he could petition for resentencing under the 1972 amendments to Hawaii's Penal Code. Moreover, he was unable to formulate such a petition on his own because the necessary Hawaiian legal materials were unavailable at Marion Penitentiary.
 
 
 9
 In setting aside the decision of a three-judge panel of this court, we en banc held that 18 U.S.C. § 5003 requires a showing of a state prisoner's need for specialized treatment as a condition precedent to transfer to the federal prison system. To reach this result, we relied upon terminology unique to § 5003, which authorizes the Attorney General to contract for such transfers "when the Director (of the Federal Bureau of Prisons) shall certify that proper and adequate treatment facilities and personnel are available...." 581 F.2d at 647 (emphasis supplied). We also relied upon the section's legislative history which we said "makes it clear that the statute is not ambiguous and that the word 'treatment' is advisedly used." Id.
 
 
 10
 Since we issued our decision in Lono, two Courts of Appeals as well as several district courts have rejected its conclusion.[12] However, no matter how many other courts may have reached a conclusion contrary to our own, absent Supreme Court pronouncement to the contrary or legislative revision,[13] a panel of this court is bound by a prior (and recent) decision of the court reached en banc. Ewing v. Williams, 596 F.2d 391, 397 (9th Cir. 1979); United States v. Poolaw, 588 F.2d 103, 105 (5th Cir.), cert. denied, 440 U.S. 966, 99 S.Ct. 1517, 59 L.Ed.2d 782 (1979); Brown v. United States, 508 F.2d 618, 625 (3d Cir. 1974), cert. denied, 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684 (1975). See also United States v. Lewis, 475 F.2d 571, 574 (5th Cir. 1972). En banc consideration is required to overrule such a decision. See generally Fed.R.App.P. 35. Hence, for purposes of decision by this panel, Lono states the applicable law, and we must reject respondents' argument that it should be overruled. Appropriate principles of stare decisis make it quite undesirable for us to reconsider here the legal propositions announced in Lono.[14]
 
 III.
 
 11
 In any event, the federal and state respondents and intervenors contend that Lono is distinguishable from the case presented by the instant petitioners. In Lono, the parties agreed that the petitioner had never received any hearing on, or a statement of reasons for, his transfer from the state to the federal prison system. The governmental respondents and intervenors argue that the record in the instant case, unlike that in Lono, clearly discloses the reasons for petitioners' transfers into federal custody. They state that the record reflects that each petitioner had been convicted of a serious crime or crimes and that each requires a high level of prison security, which for one reason or another is unavailable in the state systems. In response, petitioners argue that it is precisely because the record reveals that the transfers were for security and related reasons, that they are invalid. Such purposes of transfer, petitioners argue, do not qualify as "specialized treatment." Respondents and intervenors disagree, averring that federal maximum security institutions are "specialized treatment" facilities within the meaning of Lono, that petitioners' placement therein was for "specialized treatment," and that the procedures which accompanied petitioners' transfers were sufficient to guarantee their due process rights. Although we cannot accept the government's contentions regarding the sufficiency of the process afforded these petitioners, we generally agree that the fact that the transfers in the instant cases were for security and related reasons may qualify these transfers as responsive to a need for "specialized treatment" as required by Lono, construing 18 U.S.C. § 5003(a).
 
 
 12
 In the instant case, the magistrate found with respect to the nature of the conditions under which most of the instant petitioners were incarcerated in their respective state systems that:
 
 
 13
 The Respondents maintain that in situations where a state prisoner becomes unmanageable the state institutions are not able to properly care for them. Such situations arise when the state inmate is extremely hostile (i. e. assaults or murders other inmates) or prone to escape. Since the state correctional systems involved in the case at hand (Delaware, Hawaii, Alaska, Vermont, and New Mexico each relatively small in total population, incarcerating an equally relative small number of the type of inmates in issue) do not have the facilities to properly prevent such activity, they are constrained to either shackle the inmate or confine the inmate to his cell 24 hours a day, save an occasional 30 minute exercise period. McKay v. Wilkinson, No. CV 79-2038 (S.D.Ill., Magistrate Meyers, Sept. 28, 1979) at 10-11.
 
 
 14
 For petitioner Lawrence, whose case was before the District Court for the Western District of Wisconsin, the court made relevant findings about the lack of any long-term, maximum security prison in Vermont.[15]
 
 
 15
 In testimony before the magistrate, the executive assistant to the warden at Marion Penitentiary stated that, although Marion is the most secure of all federal facilities, it is still able to allow freedom of movement for the inmates and to provide a wide variety of programs for these inmates. Included in the activities he described are work programs; educational programs, ranging from adult basic education to college courses;[16] indoor and outdoor recreational programs; informal and formal counselling through the prison's mental health department; religious programs; and the activities of various inmate organizations such as the Jaycees and Alcoholics Anonymous.[17]
 
 
 16
 Petitioners contend that "ordinary custodial privileges such as free time, run-of-the-mill work programs, and other usual services" do not qualify as "treatment." In light of the legislative history analyzed in Lono, we conclude that "treatment" must be construed as therapeutic or rehabilitative in nature. That is, it must consist of something more than, and different from, mere incarceration, and must encompass procedures and conditions which primarily benefit the prisoner individually and not simply society as a whole.[18] However, the precise nature of such procedures and conditions may vary from prisoner to prisoner and from time to time.[19] Consequently, while we agree that mere custody does not constitute "treatment," we find petitioners' argument overly narrow because it ignores the austere conditions facing these petitioners in their respective state institutions and the wider range of opportunities available to them in the federal system.
 
 
 17
 The increased availability of programs in the federal system is an improvement upon the conditions under which petitioners would remain incarcerated in the state systems. While the availability of programs alone is no guaranty that the prisoner will participate, we find that this amelioration of conditions is likely to benefit the prisoner. Accordingly we perceive a therapeutic benefit which for these purposes may be construed as "treatment." Thus, if a sufficient array of programs is provided in connection with incarceration in a maximum security prison, it may be possible to conclude in individual cases under Lono that a need for specialized treatment has been demonstrated.
 
 
 18
 Petitioners also argue that a definition of "treatment" found in the Youth Corrections Act demonstrates that the conditions under which they are incarcerated do not qualify as "treatment." Specifically, petitioners quote 18 U.S.C. § 5006(f) which states that " 'treatment' means corrective and preventive guidance and training designed to protect the public by correcting the antisocial tendencies of youth offenders." As discussed in Lono, 581 F.2d at 647, the legislative history supports petitioners' general proposition that the definition of "treatment" found in § 5006(f) should inform our construction of that word as it is used in § 5003(a). However, this definition neither mandates a narrow definition of "treatment" nor precludes the result we reach.
 
 
 19
 The Supreme Court has stated that the range of permissible "treatment" under the Youth Corrections Act is broad. See Dorszynski v. United States, 418 U.S. 424, 434, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1972). Thus, under the Act "treatment" has been construed to range from probation to maximum security incarceration. Compare United States v. Glasgow, 389 F.Supp. 217, 221 (D.D.C.1975), with Brown v. Carlson, 431 F.Supp. at 773 (dicta). In addition, we think that the reference to "correcting ... antisocial tendencies" in § 5006(f) demonstrates that "treatment" is to be given a broader definition than just medical treatment, the limitation which petitioners would have us adopt. The legislative history of the Youth Corrections Act reveals that it was modeled, in part, on the English Borstal system. That early 20th Century system provided vocational, educational and recreational programs, now considered "run-of-the-mill," in a broad range of institutions, some walled, some completely open. H.R.Rep.2979, 81st Cong., 2d Sess., reprinted in (1950) U.S.Code Cong. & Ad.News, pp. 3983, 3987. Also, prisoners are constitutionally entitled to receive medical treatment. Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Thus, under the Act "treatment" must comprise more than simply medical treatment.
 
 
 20
 Another section of the Youth Corrections Act also supports our conclusion that "treatment" may be construed to include maximum security incarceration accompanied by participation in "run-of-the-mill" programs. 18 U.S.C. § 5011, which is captioned "Treatment," provides that "(c)ommitted youth offenders ... shall undergo treatment in institutions of maximum security, medium security, or minimum security types ...." Based on these provisions, at least, Congress did not intend that maximum security incarceration and "treatment" were to be deemed mutually exclusive. Section 5011, read in conjunction with § 5006(f), indicates that "treatment" may be construed to comprehend that kind of maximum security incarceration which provides an improvement in conditions and offers the greatest administratively feasible freedom of movement and access to programs.
 
 
 21
 To summarize, we think that even something so far removed from traditional notions of "treatment" as high security incarceration, with the opportunity to participate in attendant religious, educational, recreational and other programs, in particular cases may satisfy § 5003. We can perceive these conditions as meeting "some special treatment need with which the state required assistance." Lono v. Fenton, 481 F.2d at 648. Nothing in Lono precludes such a relatively broad construction of "specialized treatment."
 
 
 22
 However, we stress that, while a broad construction of "treatment" may be appropriate for the instant statutory purpose, in other contexts such a broad construction might be wholly inapt. Thus "treatment" and "punishment" must, for some purposes, be clearly distinguished, and distinctions among "therapeutic," "deterrent," "punitive" or "retributive" ends need to be maintained in the face of semantic confusion. Our view of "treatment" here arises from the unusual provisions and purposes of the particular statute under consideration. Under these circumstances, we think that our relatively broad view of "treatment" is justified.
 
 IV.
 
 23
 Our observations as to what may qualify as "specialized treatment" under Lono obviously cannot in and of themselves legitimize the continued federal incarceration of the instant petitioners. In Lono, the government agreed that if 18 U.S.C. § 5003 were construed to require a showing of Lono's need for specialized treatment as a condition precedent to transfer, then Lono would be entitled to a pre-transfer hearing. As earlier noted, the federal government has altered its position, arguing that a "record review," which it contends federal prison officials performed in the instant cases, was sufficient to protect petitioners' due process rights.[20] Several of the state intervenors contend that the pre-transfer proceedings which they conducted for some of the petitioners were adequate to satisfy the requirements of our decision in Lono. Petitioners argue that they were entitled to a pre-transfer hearing; however, they have failed to describe the hearing process in any detail and to indicate what should be the interaction between state and federal officials in deciding whether a transfer from state to federal custody is being made for a proper statutory purpose. Judge Doyle, in granting the petition before him, interpreted Lono as requiring that the Bureau of Prisons conduct a pre-transfer hearing. Judge Foreman did not reach this issue.
 
 
 24
 In Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), the Supreme Court considered the conditions that must be present for a prisoner to be entitled to a hearing before his transfer from one state prison to another prison within the same state. The Court "held in Meachum v. Fano, that no Due Process liberty interest of a duly convicted prison inmate is infringed when he is transferred ..., whether with or without a hearing, absent some right or justifiable expectation rooted in state law that he will not be transferred except for misbehavior or upon the occurrence of other specified events." Montanye v. Haymes, 427 U.S. 236, 243, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). In the absence of a law or practice which conditions the transfer on the happening of specified events, a prisoner was found to have no "liberty interest" deserving of due process protection in remaining in a given institution:
 
 
 25
 Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all. Meachum v. Fano, 427 U.S. at 228, 96 S.Ct. at 2540.
 
 
 26
 In the instant case, on the other hand, following Lono we conclude that prior to transfer of a prisoner from state to federal custody there must be a finding of a need for specialized treatment. This holding negates the existence of discretion, which the Supreme Court in Meachum and Montanye found to preclude the implication of a liberty interest deserving of due process protection. Hence, the guarantees of due process attach to petitioners' liberty interest in being safeguarded, in the absence of the determinations required by Lono, against transfer to federal prisons. Our task, therefore, is to determine whether the procedures provided to these petitioners to protect their liberty interest were adequate and, if not, what due process requires in establishing that the transfer of a prisoner from state to federal prison is made for a proper statutory purpose.
 
 
 27
 We are guided in our analysis of what due process requires in this situation by the balancing test the Court enunciated in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976):
 
 
 28
 (I)dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 29
 As to the first factor, the interest a state prisoner has in not being transferred to the federal system without the proper Lono findings is very substantial. The transfer may interrupt his contacts with friends and family. Equally important, it may effectively prevent his communication with legal counsel familiar with the laws of the state in which the prisoner was convicted.[21] Once in the federal system, a prisoner may be transferred unexpectedly to other federal prisons even farther removed from family and counsel. In this respect, the statute governing transfers within the federal prison system, 18 U.S.C. § 4082(b), does not create a liberty interest in federal prisoners deserving of due process protection but rather gives federal prison officials full discretion to transfer inmates. Walker v. Hughes, 558 F.2d 1247, 1253 (6th Cir. 1977); McDonnell v. United States Attorney General, 420 F.Supp. 217, 221 (E.D.Ill.1976). Similarly, reclassification of federal prisoners for purposes of treatment is fully discretionary with prison officials. The relevant statutory section, 18 U.S.C. § 4081, does not grant prisoners a protectable liberty interest. Moody v. Daggett, 429 U.S. 78, 88 n.9, 97 S.Ct. 274, 279, 50 L.Ed.2d 236 (1976).[22] Thus, while the transfer to federal facilities presumably provides a state prisoner with access to beneficial treatment, it at the same time significantly reduces, if it does not eliminate, his opportunity to maintain important contacts which may have an equally significant effect on his adjustment to prison life and on his prospects for rehabilitation.
 
 
 30
 Because of the possibility of such grievous losses, a prisoner subject to transfer under 18 U.S.C. § 5003 is more like the alleged parole violator in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 32 L.Ed.2d 484 (1972), or the state prisoner scheduled for involuntary transfer to a state mental institution in Vitek v. Jones, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (requiring more elaborate process) than like the prisoners in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (requiring less extensive process). These comparisons are based on the fact that the prisoners in McDonnell faced only a remote and contingent extension of incarceration due to lost good time credits and were thus afforded fewer procedural protections while the parolee in Morrissey or the prisoner in Vitek were confronted with immediate and tangible loss and were provided correspondingly demanding and extensive procedural protections.[23] Similarly, the loss facing the state prisoner who is about to be transferred to the federal system is qualitatively more severe than that facing the prisoners in Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 11, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668 (1979), who, because their interest in parole release determinations involved only a conditional or contingent liberty, were entitled to fewer procedural protections than the parolee in Morrissey.
 
 
 31
 The minimum due process requirements found necessary in the parole revocation situation in Morrissey included:
 
 
 32
 (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.
 
 
 33
 Morrissey v. Brewer, 408 U.S. at 489, 92 S.Ct. at 2604.
 
 
 34
 Eight years later, the Supreme Court ordered almost identical procedures for the prisoner in Vitek, who faced the deprivation of liberty involved in a transfer to a mental institution.[24] By comparison, the prisoner facing the loss of good time credits in McDonnell was found to be entitled only to notice of the charges, a statement of the evidence relied upon and of the reasons for the action, and the opportunity (if permitting him to do so would not jeopardize security or correctional goals) to call witnesses and present documentary evidence. 418 U.S. at 563-71, 94 S.Ct. at 2978-82. The prisoners in Greenholtz, who were also facing a loss of more contingent liberty interests, were found undeserving of the full panoply of Morrissey procedures. 442 U.S. at 16, 99 S.Ct. at 2108.
 
 
 35
 In our earlier description of the pre-transfer procedures which were used by the states here involved, we noted that while two of the states conducted no proceedings and the other three states employed a wide range of deliberative mechanisms, federal review of each transfer decision was uniform. According to federal counsel, the Director of the Bureau of Prisons or his representative reviewed each transferee's file and on that basis made a finding that the individual state prisoner was in need of maximum security unavailable in the state but readily available in the federal system. The language of § 5003, which states that the Attorney General may contract with the states after certification from the Director of the Bureau that treatment facilities are available, makes clear that the ultimate finding of the need for treatment and of its potential satisfaction in the federal system must come from the Director. In the instant case the federal system accepted these prisoners without any federal participation in, or direct corroboration of the determination of the need for specialized treatment and of how it could be met in the federal system. Clearly, the risk of an erroneous deprivation of an inmate's private liberty interests is relatively high in a case where the only safeguard used to insure compliance with statutory requirements is the opinion of one federal official formed by his reading a record without the opportunity for anyone the prisoner or his representative to question that opinion. As a result, we find that the decision to accept these petitioners into the federal prison system was made in derogation of their due process rights.
 
 
 36
 We think that only by utilizing (at a minimum) the procedures ordered in Morrissey will the transferee's interest be adequately protected. Morrissey, 408 U.S. at 489, 92 S.Ct. at 2604. As noted, the nature of the private interest here is similar to the immediate and tangible deprivations of liberty involved in Morrissey and Vitek. The procedures designed in these cases to elicit specific facts are appropriate in the situation in which the prisoner's criminal record, his record of incarceration, his rehabilitative needs, and suitable federal facilities must be evaluated. Also, given the fact that under § 5003(a) transfers are permitted only for the purpose of providing specialized treatment, some procedure for subsequent re-evaluation should be provided.
 
 
 37
 A hearing before federal officials is essential if the inmate is to have any opportunity to question the transfer decision and if the decision is to reflect the individual treatment needs of each prisoner. The opportunity to question would be pointless without advance notice of the basis for transfer, disclosure of the evidence upon which the officials intend to rely and an opportunity for the prisoner to present documentary and testimonial evidence. The inquiry does not present the dangers of potential disruption upon which the Supreme Court relied in McDonnell to pare the right to confrontation and cross-examination from the list of procedures to which inmates were entitled in disciplinary proceedings. 418 U.S. at 567-69, 94 S.Ct. at 2980-81.
 
 
 38
 We anticipate that at the time of a transfer hearing, the inmate's behavior in prison will already be an established matter of record. The Morrissey procedures adequately recognize the government interest in avoiding disruption by limiting, in appropriate circumstances, the inmate's right to call witnesses and to confront and cross-examine witnesses. Despite petitioners' general allegations that financial considerations guide the Bureau's decision to accept transferees, we do not interpret the Morrissey requirement of an impartial hearing body to bar Bureau officials, or in some instances state officials, from conducting the hearing. Rather, we believe that impartiality merely demands that officials who have not been associated with past determinations relating to the inmate's disciplinary or social adjustment problems render the ultimate decision of compliance with Lono. While our requiring a summation of the evidence and the reasons for decision might entail some administrative inconvenience, such procedures help insure that the decision will not be arbitrary. Finally, although we are reluctant to order that an attorney be appointed to aid the inmate seeking to prevent his transfer, we believe that the prisoner should be allowed to rely upon a lay advocate or other assistant of his choice in formulating and presenting his case.
 
 
 39
 Several of the state intervenors argue that the pre-transfer proceedings they provided their transferees were sufficient to satisfy the due process rights of the petitioners.[25] Given our determination that there must be a federally conducted hearing, their argument must fail. Nonetheless, our conclusion should not be viewed as a blanket rejection of the use of state-conducted hearings in evaluating the Lono criteria. Our holding in Lono requires that, prior to an inmate's transfer from the state to the federal prison system, two analytically distinct determinations be made: First, there must be a finding that the particular inmate is in need of specialized treatment unavailable in the state of conviction; and second, that federal treatment facilities which may satisfy that need are available. As a practical matter, state corrections officials are in the best position to assess the first factor, and federal officials are most knowledgeable about the second. Presumably, if both matters were determined in one hearing conducted by the Bureau, state witnesses would provide the bulk of the testimony. For this reason, we perceive no objection to the states making the initial determination with respect to the need for treatment, provided that state officials are able to demonstrate to the satisfaction of the Bureau that they employed the same procedures which we find are necessary to ensure that the ultimate federal certification of compliance with Lono does not cause an erroneous deprivation of the prisoner's liberty interest. In such a situation, subject to the right of the prisoner to raise objections, the federal hearing officers would have the option of affirming the state finding regarding the need for treatment and then proceeding to focus the ensuing federal hearing on whether federal facilities might satisfy that need.
 
 
 40
 This bifurcated process (involving a state hearing followed by a federal hearing) would preserve a distinct state decisionmaking role. Another option might be a single joint hearing presided over by both a state and federal hearing officer, with federal officers to make all decisions required by § 5003 as construed by Lono (and state officers presumably making any decisions required by state law). A third alternative (perhaps the simplest and cheapest from a federal viewpoint) would be merely a hearing conducted by federal officials to determine all the Lono questions.
 
 
 41
 We do not reach our conclusions about the need for hearings in ignorance of the fiscal and administrative burdens they may create. The governmental parties have briefed these issues in detail. We are also mindful that the five states involved in the instant transfers are relatively small and have not found it desirable from the standpoint of cost-effectiveness to establish adequate maximum security facilities. No doubt to return the petitioners before us to state custody will entail significant expense. In the future, however, the financial burden of conducting hearings will presumably be borne by the Bureau of Prisons since by statute its Director is the individual charged with certifying compliance with Lono. While less than a perfect solution, we believe that of the three interests before us individual, state, and federal the latter should most appropriately bear the burden of compliance with § 5003.
 
 
 42
 In any event any burdens imposed by Lono or by our decision today are well worth bearing in light of the serious allegations of "warehousing" of prisoners on a purely economic basis, which have been raised. Indeed the economics of some overcrowded and some relatively empty prisons (to the extent these can be found) must certainly exert pressures for transfers between state and federal facilities unjustified by penological considerations. But, if state and federal planning for prisons is anywhere near the mark, the number of prisoners requiring transfer should always be modest. Therefore, the economic costs of due process should not be unbearable. Measured against the human costs of unjustifiable transfers, these economic costs must weigh lighter on the scales. The investment in due process is not only mandated by the Constitution but promises to yield a generous return in the precious coin of human dignity.
 
 
 43
 AFFIRMED.
 
 
 44
 PELL, Circuit Judge, concurring.
 
 
 45
 If I were free to do so, I would dispose of this case on the basis of the dissenting opinion in Lono v. Fenton, 581 F.2d 645 (7th Cir. 1978). I am not, however, free to do so because that case is an en banc decision of this court, and I have no reason to believe that the majority of active judges of this court would deviate from the position taken in that case, notwithstanding that the First and Second Circuits have reached the opposite result. I do think that Judge Cudahy's opinion in the present cases represents a reasonable application of the established position of this circuit on the issue, particularly in view of facts developed in the present cases which were not brought out in Lono. I, therefore, concur in Judge Cudahy's opinion.
 
 
 46
 In view of the very real problem experienced by some smaller states, as demonstrated by these cases, of coping with high-risk prisoners, in the interest of public safety it appears imperative to me that an early solution of the problem presented by transfers from state to federal institutions should be reached.
 
 
 47
 That solution could be reached under the existing statute by the grant of certiorari by the Supreme Court, in view of the fact that there is a split between circuits. For some reason, the Department of Justice did not choose to pursue certiorari on the Lono case. Irrespective of whether the Department does so in this case, there are intervening parties in the present litigation who have a vital interest in the subject and who may want to follow through in an attempt to secure a definitive opinion.
 
 
 48
 The other source of a solution, of course, is the Congress. That body, according to Judge Cudahy's opinion, has the matter of revision before it. I note, however, that this consideration is a part of a much larger subject, a comprehensive revision of the United States Criminal Code. To the extent that Judge Cudahy's marginal note expresses optimism for an early amendment of the legislation, I find myself unable to share in the expression. I particularly note the provision in the House version. I think the House Committee's observation that it does not wish to take a position in the controversy between the circuits is particularly distressing. The sole controversy between the circuits arises from the endeavor of the courts to determine what Congress meant in the existing statute. Congress now has a chance to make it clear what it means in the future and, in doing so, it is not taking anyone's side in a controversy. It is merely engaging, as is its particular governmental responsibility, in establishing future policy applicable to certain federal institutions.
 
 
 49
 BAUER, Circuit Judge, concurring.
 
 
 50
 For the reasons stated in the dissent in Lono and the subsequent history of similar problems in other circuits, I would prefer that this Circuit overrule Lono en banc. This desire, however, does not blind me to the fact that Lono is the present law of the Seventh Circuit and the instant decision is a step in the right direction. As a purely pragmatic matter, I approve of this movement and particularly its direction. A partial retreat from Lono is better than no retreat at all. Until, therefore, the problem is either remedied by Congress, the Supreme Court or our own Circuit, I concur in the present opinion.
 
 
 51
 HARLINGTON WOOD, Jr., Circuit Judge, concurring.
 
 
 52
 The panel opinion goes about as far as it reasonably can to resolve a situation which was not created by Lono, but by the Bureau of Prisons' obscure decision some time in the past to ignore the limitations enunciated by the Attorney General who proposed the legislation, the restricting comments of the Congress which adopted it, and the distinctive "treatment" language of the statute itself.
 
 
 53
 Even if I considered myself some kind of a federal ombudsman instead of a judge, I would send the problem back to the executive and legislative branches to determine as a matter of policy what is desired. If a national prison system instead of a federal prison system is to be enacted, it should be accomplished by the Congress and not the court. I do not believe it is up to judges to provide the states with an unlegislated method merely to permit them to avoid one of their most troublesome local responsibilities. States should be expected to take care of their own except within the limitations of the present statute until such time as Congress makes it clear that the Bureau of Prisons is authorized generally to go into the rent-a-prison business. That business, if approved, should prove to be a good one because the federal prison system is considered to be the best managed and most progressive penal system in the world. I believe that judgment to be well deserved. However, if our federal prison system is as overloaded as we often hear it is, I would hesitate to advertise for foreign clientele, particularly for those not wanted at home. The states, I believe, would be better served in the long run to emulate federal penal progress, rather than by just renting it.
 
 
 54
 The hearing required by the panel opinion I do not view as a mere charade to permit indiscriminate transfer of state prisoners to federal custody. In my judgment those hearings may be subject to further judicial review which suggests at least a minimum record must be kept.
 
 
 55
 A state prisoner who is injected without his consent into the federal nationwide penitentiary orbit away from counsel, family and friends by reason of a bureaucratic decision unsupported by specific justification at a hearing, and all without clear congressional authorization, suffers a form of banishment which I decline to approve.
 
 
 
 [1]
 This opinion has been circulated among all judges of this court in regular active service. A majority did not favor a rehearing en banc on the question of overruling or partially overruling a prior decision of this court, Lono v. Fenton, 581 F.2d 645 (7th Cir. 1978), or on the question of conflict with opinions in other circuits. The opinion of Judge Bauer concurring in this opinion in the absence of en banc consideration and the opinion of Judge Wood concurring in the denial of such consideration follow Judge Pell's opinion concurring as a member of the panel
 
 
 [2]
 Section 5003(a) provides:
 The Attorney General, when the Director shall certify that proper and adequate treatment facilities and personnel are available, is hereby authorized to contract with the proper officials of a State or Territory for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such State or Territory: Provided that any such contract shall provide for reimbursing the United States in full for all costs or other expenses involved.
 
 
 [3]
 Vermont closed its only maximum security institution in 1975. The states of Hawaii, Alaska, Delaware and New Mexico contend they do not have high-security facilities, or such facilities in adequate quantity, to provide for the incarceration of these petitioners
 
 
 [4]
 This policy requires that one or more of the following "criteria for federal transfer" must be met:
 
 
 [1]
 All in-state treatment and rehabilitative programs available for that individual have been considered and determined unsuitable
 
 
 [2]
 All in-state alternatives in the area of security have been considered and found unsuitable for providing the required degree of security or protective custody for a particular resident
 
 
 [3]
 A resident voluntarily requests transfer
 Vermont Dep't of Corrections Policy 891 (1975) reprinted in Appendix to Brief for Intervenor-Appellant Hogan at 22.
 
 
 [5]
 Specifically, the record reveals the following details concerning the crimes for which the petitioners from Vermont were convicted and the reasons that prompted state officials to seek their transfers:
 Ray Girouard is serving a life sentence entered in 1976 after his conviction in Vermont for first-degree murder. He is allegedly a suicide and escape risk as well as a management problem. In February 1976, a hearing officer, pursuant to the Vermont out-of-state transfer policy, determined that Girouard's transfer was appropriate because of the length of his sentence, his attempts to escape, and the unavailability of state programs and inadequate security. Girouard was sent to Marion Penitentiary in March 1976. Since then, prison officials have held Girouard in close custody because he has been found to be a management problem and because he was found in possession of a knife.
 Petitioner John H. Killary is serving a life sentence as a result of his October 1974 Vermont conviction for first-degree murder. At his Vermont transfer hearing in 1975, from which Killary was voluntarily absent, it was determined that because of his long sentence and his need for protective custody due to his reputation as a prison informant, Killary should be transferred into federal custody. Since arriving at Marion Penitentiary in May 1975, Killary has received numerous incident reports, reflecting disruptive and threatening behavior.
 Petitioner John E. Kasper is serving three concurrent life terms imposed by the Vermont courts because of his status as an habitual offender as well for his conviction for numerous escapes. At his transfer hearing, it was determined that, given Kasper's past attempts to escape, his failure to respond to institutional programs, and the length of his sentence, he should be transferred to federal custody. In June 1977, Kasper entered the federal system at the U.S. Penitentiary at Leavenworth, Kansas ("Leavenworth Penitentiary"). He was subsequently transferred to Marion Penitentiary in September 1978.
 Petitioner William Lawrence is serving a term of eight and one-half to thirteen years entered by a Vermont court in September 1977 upon his conviction for attempted armed robbery. At his Vermont transfer hearing, it was determined that the state's facilities provided unsuitable rehabilitative programs and inadequate security. He has been confined at the Oxford FCI since early 1978.
 
 
 [6]
 The record discloses the following relevant background information about the three Hawaiian petitioners:
 George Shimabuku is serving two life sentences without possibility of parole after convictions in Hawaii for murder. He has been diagnosed by Hawaii officials as a sociopath having "one of the worst conduct records" in Hawaii state prison. See Hawaii Dep't of Social Services, Individual Evaluation Summary, Jan. 21, 1969, Gvt. Ex. 3 attached to Transcript of Proceedings before Magistrate, May 7, 1979, Record at No. 11. In April 1969, petitioner was transferred to the federal system without a hearing. He was placed first in Leavenworth Penitentiary and then transferred to Marion Penitentiary.
 Petitioner Peter M. K. Lono, (reportedly a cousin of Kenneth Lono, who was the petitioner-appellee in our en banc Lono decision) is serving a term of from 12 to 99 years after his conviction in Hawaii for second-degree murder. Following a February 1977 meeting with state officials, Lono was transferred into the federal system. During this pre-transfer hearing, it was discovered that the reasons for his transfer to Marion Penitentiary were partially disciplinary in nature. Although affidavits executed by Hawaii correctional officials in January 1979 state that Lono was transferred because there were specialized treatment facilities available for him in federal prisons, we note this finding followed his transfer by almost two yers. The affidavits do not state that a determination was made that Lono required specialized treatment.
 Petitioner William K. Mederios is serving a 20-year sentence for a burglary conviction, a 10-year concurrent sentence for conviction of possession of a harmful drug, a 5-year sentence for escape, and a life sentence for first-degree murder. Following a meeting with state officials in January 1975, Mederios was transferred to the federal system, first to the U.S. Penitentiary at McNeil Island, Washington ("McNeil Penitentiary"), and then to Marion Penitentiary. Although Mederios stated in the hearing before Magistrate Meyers that he was advised in his pre-transfer meeting that he was being transferred because the federal prison system had treatment facilities unavailable in Hawaii, we agree with Magistrate Meyers' conclusion that no showing was made at the meeting that Mederios required such treatment.
 
 
 [7]
 The following background information on the Alaska petitioners is relevant:
 Petitioner Donald Morgan is serving a life sentence and additional consecutive sentences totaling eight years after his convictions in Alaska for first-degree murder (committed while on escape status) for two counts of escape, and for grand larceny. Morgan allegedly was a severe management problem, and following a personal review hearing in November 1976, state officials decided to transfer him to federal custody. The reasons given for the transfer were the seriousness of the crime for which he was convicted, his escape risk status, and his continued poor institutional adjustment. Morgan was sent to McNeil Penitentiary in November 1976, to Leavenworth Penitentiary in February 1977, and to Marion Penitentiary in August 1977.
 Petitioner Dennis Ray Anthony is serving a life sentence as well as consecutive sentences totaling twenty-three years imposed after his convictions in Alaska for first-degree murder, escape, and rape committed while on escape. Anthony also was afforded a personal review hearing in June 1975, after which state officials recommended his transfer to federal custody because of the length of his sentence, the seriousness of the crime for which he was convicted, and his escape risk status. He was sent to Leavenworth Penitentiary in July 1975 and subsequently transferred to Marion Penitentiary.
 
 
 [8]
 The record yields the following information on the Delaware petitioners:
 Petitioner Aubrey McKay is serving a 30-year sentence for a manslaughter conviction and a sentence equivalent to 595 years for convictions for rape, kidnapping, robbery, burglary, and other offenses committed while on furlough from his sentence for the manslaughter conviction. McKay was formerly incarcerated at Smyrna Prison in Delaware, which was under court order to limit the number of inmates. See Anderson v. Redman, 429 F.Supp. 1105 (D.Del.1977). According to state officials who did not conduct a pre-transfer hearing, this circumstance, coupled with what they allege was the fact that McKay was in danger from his fellow inmates, who believed McKay's activities caused curtailment of the furlough policy, brought about McKay's inclusion in a group of 40 inmates transferred to federal custody in August 1978. McKay was sent to several federal institutions, including most recently Marion Penitentiary.
 Petitioner Carl Henry is serving a sentence totaling 69 years for various offenses including attempted murder, assault with intent to murder, assault on a guard, and attempted escape. Like McKay, he was among the group of 40 inmates Delaware officials transferred to federal custody pursuant to court order. Prior to going to Marion Penitentiary, he did not receive a pre-transfer hearing.
 
 
 [9]
 The only New Mexico petitioner, Leo McGill, is serving a sentence of 75 to 275 years as a result of his conviction for armed robbery. Petitioner testified that he received no pre-transfer hearing and was told that he was being transferred to federal custody because he was a security risk. In March 1973, McGill was sent directly from New Mexico to Marion Penitentiary
 
 
 [10]
 Prior to this hearing, the magistrate granted motions to intervene filed by the following parties: Vermont's Commissioner of Corrections Cornelius Hogan; the state of Hawaii; the state of Alaska; and the state of Delaware
 
 
 [11]
 Judge Doyle also granted Vermont's Commissioner of Corrections Hogan leave to intervene in the case
 
 
 [12]
 See, e. g., Howe v. Civiletti, 625 F.2d 454 (2d Cir. 1980); Sisbarro v. Warden, 592 F.2d 1 (1st Cir.), cert. denied, 444 U.S. 849, 100 S.Ct. 99, 62 L.Ed.2d 64 (1979); Bowers v. Fenton, 488 F.Supp. 570 (M.D.Pa.1979); Spence v. Fenton, Civ. No. 79-277 (M.D.Pa. Sept. 18, 1979); Gomes v. Moran, 468 F.Supp. 542 (D.R.I.1979); Fletcher v. Warden, 467 F.Supp. 777 (D.Kan.1979); Shakur v. Bell, 447 F.Supp. 958 (S.D.N.Y.1978)
 
 
 [13]
 In an order of November 29, 1979, directed to the Government, we stated in pertinent part as follows:
 The en banc decision of this court in Lono was filed on July 25, 1978. No Petition for Certiorari was sought by the United States. Now well over a year later this court is faced with Lono questions being raised by numerous state prisoners in federal custody in this circuit. We assume that the Department of Justice has not chosen to ignore Lono in this circuit. It was suggested by the majority opinion in Lono that legislation was needed to conform Bureau of Prisons' practice to the law. Government counsel is requested to advise this circuit what, if anything, is being done by the Department of Justice in this regard. Girouard v. Wilkinson, No. 79-2361 (7th Cir. Nov. 29, 1979) (order setting and consolidating briefing, appointing counsel, and requesting information) at 2-3.
 Rather belatedly, the Government responded to our order in its reply brief, informing us that the Justice Department had submitted amendatory language for § 5003 to the staff of the Senate Judiciary Committee, which is considering a comprehensive revision of the United States Criminal Code. The Senate bill proposes that § 5003(a) be replaced with the following provision from which any reference to "treatment" facilities is noticeably absent:
 The Director may contract with the proper authorities of a State, territory, or locality, or, at the request of the tribal leaders, with an Indian tribe, for the official detention, including safekeeping care, subsistence, correctional programs and employment, in a federal penal or correctional facility, of a person convicted of an offense in a court of such State or territory or Indian tribe, if the Director finds that proper and adequate penal or correctional facilities and personnel are available....
 S. 1722, 96th Cong., 1st Sess. § 573(b) (1980).
 S. 1722 was reported favorably by the Committee on January 17, 1980, and passage by the Senate is currently expected within a short time. The Committee report which accompanies the bill makes no explanation for the omission of the reference in § 5003 to "treatment." See S.Rep.No.553, 96th Cong., 2d Sess. 1222-23 (1980).
 On July 2, 1980, the House Judiciary Committee reported to the full House of Representatives its recommended revisions of the Criminal Code. Included in that bill is the following provision which retains § 5003's reference to "treatment":
 The Attorney General, when the Director certifies that proper and adequate treatment facilities and personnel are available, is authorized to contract with the proper officials of a state for the custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such State or territory, but any such contract shall provide for reimbursing the United States in full for all costs or other expenses involved.
 H.R.6915, 96th Cong., 2d Sess. § 3918(a) (1980).
 The report which accompanies the bill acknowledges that our opinion in Lono differs from the positions taken on the issue by the Courts of Appeals for the First and Second Circuits, see note 12 supra, but states that the Committee does not wish to take a position in the controversy. See H.Rep.No.96-1396, 96th Cong., 2d Sess. at 480 (September 25, 1980).
 Obviously, if the bills for revision are passed by the respective Houses of Congress, they will presumably go to the conference committee and, thence (after further action by the House and Senate and absent unforeseen obstacles) to the President. As a result legislative action having a major impact on the Lono doctrine may take place in the near future.
 Contrary to the cautious hopes for legislative action held out in this footnote, at the date of issuance of this opinion, the Ninety-Sixth Congress had adjourned sine die, without passing this legislation for revision of the Criminal Code.
 
 
 [14]
 Although for good reason we decline here to reexamine the merits of Lono, we note that in its reply brief, Delaware presents an argument, not presented in Lono, which it claims requires overruling that decision. This argument is based upon 18 U.S.C. § 5003(c), which Delaware claims may not be read consistently with § 5003(a) as construed in Lono. Section 5003(c) provides:
 Unless otherwise specifically provided in the contract, a person committed to the Attorney General hereunder shall be subject to all the provisions of law and regulations applicable to persons committed for violations of laws of the United States not inconsistent with the sentence imposed.
 Delaware's argument may be summarized, as follows: In the discretion of federal prison officials, federal prisoners may be denied access to treatment programs. Pursuant to § 5003(c), once they are in the federal system, state transferees are to be treated as if they were federal prisoners. Accordingly, state transferees also may be denied access to such programs. Thus, our decision in Lono leads to an anomalous result that state prisoners, who may not be transferred into the federal prison system absent a demonstration that they require specialized treatment available only there, after being received into the federal system, may be denied such treatment.
 This argument falls of its own weight. First, Delaware implicitly concedes that § 5003(a) and § 5003(c), by their terms, do not address the same problem. The former specifically sets the criteria for the transfer of state prisoners into the federal system, while the latter generally sets forth the manner in which transferees are to be treated. "It is a cardinal principle of statutory construction that the more specific controls over the more general." Central Commercial Co. v. Commissioner, 337 F.2d 387, 389 (7th Cir. 1964) quoted in First Bank of Oak Park v. Avenue Bank, 605 F.2d 372, 375 (7th Cir. 1979). Moreover, the two subsections are not necessarily inconsistent. Section 5003(c) may be construed as authorizing federal prison officials to subject transferees to the same disciplinary rules as federal prisoners. Such a construction is supported by the legislative history of § 5003(c), which states that "... all prisoners, when possible, should be treated alike in order that there be no favored inmates or groups of inmates." H.R.Rep.1663, 82d Cong., 2d Sess., reprinted in (1952) U.S.Code Cong. & Ad.News, pp. 1420, 1421. Similarly, § 5003(c) also may be construed as authorizing the retransfer among the various federal prisons of transferees once that they are lawfully received into a federal prison, just as federal prisoners are subject to intra-system transfers. Such transfers would not necessarily violate Lono, although we believe that it is implicit in our holdings in Lono and in the instant case that intra-system transfers of transferees from state prisons may not be made to facilities which lack the treatment programs which permitted their initial reception into the federal prison system. What procedural requirements, if any, attend such transfers is a question we need not, and do not, decide.
 
 
 [15]
 "Because there was no such facility, treatment and programs available to minimum and medium security prisoners in Vermont were not available to petitioners." Lawrence v. Elsea, 478 F.Supp. at 483
 
 
 [16]
 Petitioner Anthony has earned a Bachelor of Arts degree from Southern Illinois University while in federal custody
 
 
 [17]
 Unfortunately, the record does not disclose the conditions under which inmates at FCI Oxford are incarcerated. Unless FCI Oxford is a maximum security facility, a fact we question (see U.S. Dep't of Justice, Facilities '78 at 19 (1978); see also Brown v. Carlson, 431 F.Supp. 755, 760-61 (W.D.Wis.1977)), we are perplexed why the state of Vermont could not accommodate petitioner Lawrence within its own system
 
 
 [18]
 We recognize, of course, that by protecting society as a whole, the prison system may incidentally be doing something in the prisoner's best interest, albeit without his knowledge. However, we believe that the "specialized treatment" required by Lono must consist of something which directly enhances the well-being of the individual prisoner
 
 
 [19]
 Historically, the "treatment" of criminals has varied greatly. For example, hard labor, originally thought of as punitive, subsequently was seen as rehabilitative. See United States v. Moreland, 258 U.S. 433, 449-50, 42 S.Ct. 368, 374, 66 L.Ed. 700 (1922) (Brandeis, J., dissenting). "Treatment" also has been thought to include psychosurgery, behavior modification, and general education. See generally Allen, The Decline of the Rehabilitative Ideal in American Criminal Justice, 27 Clev.St.L.Rev. 147 (1978)
 
 
 [20]
 In oral argument, however, government counsel seemed to broaden her position to include a hearing within the definition of what minimum due process requires
 
 
 [21]
 See Gomes v. Travisono, 490 F.2d 1209, 1217 (1st Cir.), (Campbell, J., concurring), vacated 418 U.S. 909, 94 S.Ct. 3200, 41 L.Ed.2d 1155, aff'd. as modified, 510 F.2d 537 (1974) ("(T)o be cast outside the jurisdiction within which one was sentenced is often to be separated from rights, privileges, and standards otherwise available to become to some degree, a 'man without a country'."); Tai v. Thompson, 387 F.Supp. 912, 915 (D.Hawaii) ("Just as a prisoner who is put in isolation for disciplinary reasons is prevented from having meaningful contact with friends or family, a transferee may suffer the same harm."); Hoitt v. Vitek, 361 F.Supp. 1238, 1248-50 (D.N.H.1973), aff'd sub nom. Laaman v. Vitek, 502 F.2d 1158 (1st Cir. 1974) (Describing nine adverse effects which transfer may have, including a detrimental impact on the rehabilitation of the prisoner); Capitan v. Cupp, 356 F.Supp. 302, 303 (D.Ore.1972) ("I am satisfied that the transfer of a prisoner from a state institution to a federal prison 2,000 miles away from his family and his home is a 'grievous loss' which requires the imposition of some procedural safeguards.")
 
 
 [22]
 Intervenors from the states of Hawaii, Delaware, and Vermont cleverly argue that the same discretion which federal officials are granted in handling prisoners already in the federal system, should apply to the decision to transfer prisoners from state to federal custody. This argument ignores the differences in language between 18 U.S.C. § 5003 and the statutory sections governing operation of the federal prison system. The liberty interest that a state prisoner has in not being transferred to federal custody without a determination of a need for specialized treatment and of probable satisfaction of that need in the federal system is created by language which is missing in the analogous sections governing transfer and treatment of federal prisoners
 
 
 [23]
 As the Court observed in McDonnell,
 For the prison inmate, the deprivation of good time is not the same immediate disaster that the revocation of parole is for the parolee. The deprivation, very likely, does not then and there work any change in the conditions of his liberty. It can postpone the date of eligibility for parole and extend the maximum term to be served, but it is not certain to do so, for good time may be restored. Even if not restored, it cannot be said with certainty that the actual date of parole will be affected; and if parole occurs, the extension of the maximum term resulting from loss of good time may affect only the termination of parole, and it may not even do that.
 418 U.S. at 560-61, 94 S.Ct. at 2976-77.
 
 
 [24]
 The minimum due process requirements found to be necessary in Vitek included:
 "A. Written notice to the prisoner that a transfer to a mental hospital is being considered;
 "B. A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given;
 "C. An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination;
 "D. An independent decisionmaker;
 "E. A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate;
 "G. Effective and timely notice of all the foregoing rights.
 
 
 [100]
 S.Ct. at 1264, quoting Miller v. Vitek, 437 F.Supp. 569, 575 (D.Neb.1977)
 
 
 [25]
 This argument is advanced by the states of Vermont, Hawaii, and Alaska. The Vermont hearings were conducted pursuant to the following procedures established by the state's transfer policy:
 
 
 [1]
 When a hearing is requested on a case involving possible out of state transfer, the resident will receive written notice of the hearing, and the reasons for the proposed transfer, at least 24 hours ahead of time scheduled for the hearing. The Superintendent at the holding facility will be responsible for the proper notification of the resident
 
 
 [2]
 The inmate may waive the hearing, in writing, if he chooses
 
 
 [4]
 The resident will be allowed to be present at the hearing, testify on his own behalf, call witnesses or present documentary evidence, so long as this is not unduly hazardous to institutional safety or correctional goals. The resident may be represented by law counsel from the facility staff where this is feasible
 
 
 [5]
 After the hearing is held, the Hearing Officer will notify the Director of Community Correctional Centers of the results .... The Director of Community Correctional Centers will forward these results, ... to the Commissioner. Based on this report, ... the Commissioner will make the final decision. The Commissioner will notify the Director of Community Correctional Centers, in writing of his decision. The Director of Community Correctional Centers will then notify the Superintendent of the sending facility. The Superintendent will then be responsible for the notification of the resident
 
 
 [6]
 If a prior hearing cannot be afforded because the delay required would endanger the safety of the resident or the security of the facility, the Commissioner may order the transfer, and the hearing may be held up to 10 days after the resident is moved. This hearing shall be conducted before a hearing officer designated by the Commissioner. The reasons for the delay will be given to the resident in writing at the time of transfer. The transfer order will include a statement of the inmate's right to a hearing within this designated time limit. As with hearings held prior to transfer, the report will be forwarded to the Commissioner, who will confirm or reverse the transfer, and notify the inmate, in writing, of his decision, including a copy of the hearing results
 Vermont Dep't of Corrections Policy, supra note 4 at 24-25.
 Except for its apparent failure to allow the inmate an opportunity to cross-examine and confront witnesses, this policy appears to satisfy the Morrissey requirements.
 Apparently, the Hawaii practice, prior to transferring a prisoner to the federal system, is to conduct a hearing with the inmate present. Several days' advance notice is given, and following the hearing, the inmate receives a statement of reasons for the transfer. From the record, it is unclear whether the inmate may present evidence and cross-examine witnesses. A state court reviewing one of the petitioner's objections to his transfer was satisfied that the inmate was given an opportunity to testify and present evidence. In oral argument, counsel for Hawaii stated that the hearing is informal and that the recommendation which results is advisory only to the state correctional superintendent. Counsel for Delaware stated that Delaware's procedure is like Hawaii's. The details of the Alaska pre-hearing procedures are less than clear from the record. Some type of pre-transfer meeting was apparently held with the inmates. The affidavit of a state official states that one of the transferees received notice of the meeting and an opportunity to present evidence at the meeting; the prisoner himself testified the proceeding was one at which he was merely informed of his transfer. He also stated he received notification, but apparently not the reasons for his transfer. The other Alaska petitioner received a hearing, the precise nature of which is unclear, and a fairly substantial explanation of reasons for his transfer. In oral argument, counsel for Alaska stated that the proceeding is conducted in accordance with Alaska's administrative code, which he stated requires: a hearing; notice; and an opportunity to be heard, to present witnesses, and to confront adverse witnesses.